## IN THE SUPREME COURT OF TENNESSEE
### AT JACKSON

FOR PUBLICATION

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | **Filed: December 1, 1997** |
| | ) | |
| Appellee, | ) | SHELBY COUNTY |
| | ) | |
| v. | ) | Hon. Arthur T. Bennett |
| | ) | Judge |
| ANDRE S. BLAND, | ) | |
| | ) | |
| Appellant, | ) | Supreme Court |
| | ) | No. 02-S01-9603-CR-00032 |

FILED

December 1, 1997

Cecil Crowson, Jr.
Appellate Court Clerk

FOR APPELLANT:

William L. Johnson
Patricia A. Odell
50 North Front St., Suite 1150
Memphis, Tennessee

FOR APPELLEE:

John Knox Walkup
Attorney General & Reporter

Michael E. Moore
Solicitor General

Darian B. Taylor
William David Bridgers
Assistant Attorneys General
Criminal Justice Division
Nashville, Tennessee

John W. Pierotti
District Attorney General

Thomas D. Henderson
David C. Henry
Assistant District Attorneys General
Memphis, Tennessee

# O P I N I O N

TRIAL COURT AND
COURT OF CRIMINAL APPEALS AFFIRMED.          DROWOTA, J.

In this capital case, the defendant, Andre S. Bland, was convicted of premeditated first degree murder, attempted aggravated robbery, especially aggravated robbery, and attempted first degree murder.[1] In the sentencing hearing, the jury found one aggravating circumstance: "[t]he murder was especially heinous, atrocious or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death." Tenn. Code Ann. § 39-13-204(I)(5) (1991 Repl. & 1996 Supp.). Finding that the aggravating circumstance outweighed mitigating circumstances beyond a reasonable doubt, the jury sentenced the defendant to death by electrocution.

On direct appeal to the Court of Criminal Appeals, the defendant challenged both his conviction and sentence. After fully considering the defendant's claims, the Court of Criminal Appeals affirmed the trial court's judgment. Thereafter, pursuant to Tenn. Code Ann. § 39-13-206(a)(1) (1996 Supp.),[2] the case was docketed in this Court.

The defendant raised several issues in this Court, but after carefully examining the entire record and the law, including the thorough opinion of the Court of Criminal Appeals and the briefs of the defendant and the State, this Court, on December 9,

---

[1] The trial judge imposed an effective fifty year sentence for the convictions of attempted aggravated robbery, especially aggravated robbery, and attempted first degree murder. In this appeal, the defendant does not challenge those convictions or sentences.

[2] "Whenever the death penalty is imposed for first degree murder and when the judgment has become final in the trial court, the defendant shall have the right of direct appeal from the trial court to the Court of Criminal Appeals. The affirmance of the conviction and the sentence of death shall be automatically reviewed by the Tennessee Supreme Court. Upon the affirmance by the Court of Criminal Appeals, the clerk shall docket the case in the Supreme Court and the case shall proceed in accordance with the Tennessee Rules of Appellate Procedure."

1996, entered an Order limiting review to four issues and setting the cause for oral argument at the April 1997 term of Court in Jackson. <u>See</u> Tenn. S. Ct. R. 12.[3]

For the reasons explained below, we have determined that none of the alleged errors have merit. Moreover, the evidence supports the jury's findings as to the aggravating and mitigating circumstances, and the sentence of death is not disproportionate or arbitrary. Accordingly, the defendant's conviction for first degree murder and sentence of death by electrocution are affirmed.

## FACTUAL BACKGROUND

The evidence presented at the guilt phase of the trial established that on the evening of October 9, 1992, the defendant, then nineteen years old, along with Darryl Bailey, Martell Pollard, Carlos Sanders, and two men known only as Steve and Yogi, attended a crap game at the apartment of Charles Sanders in the Southbrook Apartment Complex in Memphis. When the crap game ended around 10:00 p.m, these young men wandered outside and, at some point between 10:30 and 11:30 p.m., decided to rob two strangers, Earnest Norman and Marcel Nugent, whom they had seen arriving at the complex earlier. Nugent had come along to the complex with Norman to visit a friend. Norman and Nugent both testified that when they arrived, four to six men were standing around in the parking lot, and as they were nearing Norman's car to leave about thirty minutes later, the group of men approached them, asked who they were, where they were from, and whether they had any money.

_____

[3]Tennessee Supreme Court Rule 12 provides in pertinent part as follows: "Prior to the setting of oral argument, the Court shall review the record and briefs and consider <u>all</u> errors assigned. The Court may enter an order designating those issues it wishes addressed at oral argument."

-3-

When Norman and Nugent ignored the group of men, one of the defendant's party struck Norman in the back of the head as he was about to get into his car. Norman fled. As he ran, Norman realized he was being pursued by one of the men, and he heard someone urging another person to shoot, and then heard a gun fire. Norman escaped unhurt to a nearby service station and called 911.

In the meantime, Nugent, who had locked himself inside Norman's car, found himself trapped and surrounded by the group of men as they tried to force him out of the car. About this time, the victim of the murder, twenty-year-old Ontrain (Terry) Sanders,[4] drove into the parking lot, got out of his car, and approached the men surrounding Nugent. According to Nugent, the men said something to Sanders, who turned and headed back to his car without replying. The defendant then fired a gun, hitting Sanders in his right leg. Bleeding profusely, Sanders fled some 273 feet, almost 100 yards, through the apartment complex. The defendant and Darryl Bailey jogged after Sanders who was limping from the leg injury. When, during the chase, the defendant shot Sanders in the leg again, Sanders attempted to hide under a pickup truck. However, Sanders was discovered and the defendant shot him at least two or three more times while he lay underneath the truck. The defendant and Darryl Bailey then left Sanders, under the truck, pleading for help, and ran back around the apartment complex to the car where Nugent was trapped.

Upon hearing gunfire, Henry Adams, who lived in an upstairs apartment, looked out his back door and saw a man with a large shiny gun kneeling down as if

---

[4]Sanders was not related to either Charles or Carlos Sanders, the hosts of the crap game; and there is no indication that he knew any of the men involved in the attack on Norman and Nugent.

shooting under the truck. Adams heard three shots fired, then saw the man with the gun turn and run. Hearing a man screaming, "Oh God, please help me," Adams called 911 just after midnight. When Adams returned to his back door to look out into the parking lot, he saw someone trying to crawl out from underneath the pickup truck, and heard the person yelling and pleading for help for a short while longer.

Floyd P. Johnson owned the green pickup truck under which Sanders had taken refuge, and Johnson's upstairs apartment also overlooked the area in which the shooting occurred. Johnson testified that after hearing three gunshots, he looked out his window and saw a man lying partially under his truck with his upper body exposed and covered in blood. Johnson testified that the man was calling out, "Oh God, help me!" Because he feared for his own safety, Johnson stayed on his balcony, but attempted to calm Sanders down by talking to him and encouraging him to remain still. Johnson said he talked with Sanders for ten or fifteen minutes until the ambulance arrived.

While Sanders fought for his life under the truck, the defendant and Darryl Bailey returned to Norman's car. Bailey helped the group of men break through the passenger window and pull Nugent from the automobile. Nugent scuffled with the men before breaking free. As Nugent fled, his jacket was pulled off his back. According to Martell Pollard when someone shouted, "he has a gun," the defendant shot Nugent in the leg. The men then took his watch and his money, kicked him, beat him, and finally, the defendant again shot Nugent in the leg. The group of men then disbanded, leaving Nugent lying in the parking lot. Nugent made it upstairs to the apartment of Norman's friend, where he waited until an ambulance arrived.

-5-

The first ambulance on the scene transported Sanders to the hospital. One of the paramedics testified that the unit arrived nine minutes after receiving the call, but Sanders' condition was very grave at the time of their arrival. Sanders died in the ambulance on the way to the hospital.

Two days later, at the urging of his mother and grandmother and after learning that the police were looking for him, the defendant turned himself into the Memphis Police Department on the afternoon of October 12, 1992, approximately two days after the killing. At that time, the defendant gave a statement in which he confessed to shooting Nugent and Sanders with a chrome 9-millimeter pistol. The following is the defendant's account of the crime:

> Me, Little Darryl, Carlos' daddy, Carlos, and a guy named Pat were shooting dice. We were inside Carlos Sanders' house inside the Southbrook Apartments. Little Steve knocked on the door and he came out and got the 9-millimeter pistol that I had. By that time I got up and came outdoors and got the gun from Little Steve. And Yogi approached me saying he was fixing to rob dude that was up in the house. Carlos, Martell, Yogi, Darryl, Steve and me were standing out there, and Yogi was telling us he was going to rob the dude. I gave him the gun, the 9-millimeter. By that time the dudes had come out the apartment. Yogi approached him saying something to him, and then they got into physical contact. Then he hit the dude and the dude broke loose and ran. The other dude got in the car and locked himself in. Steve and Darryl grabbed objects from the ground and started hitting the car window. Darryl pulled the dude up out of the car. Steve, Yogi, Darryl, Carlos, Martell, they was hitting the dude with objects they picked up. I got the gun back from Yogi, and the dude in the Cadillac [the victim] drove up and jumped out and started towards us. And then I shot him in his leg. Then he went around the building and I went around the building and shot him in his leg again. And then he had tried crawl up under a truck and I shot him again. Then he continued up under the truck. I went back around the corner, and they was continuing to beat the dude that got out of the car. Then I walked up and shot in both his legs. I wasn't shooting to kill, that's why I shot

them in their leg. I turned around, threw the gun and ran to the Kings Gate Apartments over to my girlfriend house, Teresa Wiggs. . . . and then we went to sleep.

When asked by the police why he shot Sanders the first time, the defendant replied, "Because when they was beating on the dude, he jumped out and approached us and said, 'What's up?' And I turned around and I shot him in his leg." The defendant said that he shot Nugent "so he couldn't get away." The defendant denied getting any money or valuables from either Sanders or Nugent or being involved in the robbery. He knew the other men "went in the dude pockets" but did not know if they got anything. Nugent, however, testified that he was robbed. In addition, police found an unemployment check, a bloody dollar bill and assorted change, keys, and a black cap near the pickup truck where Sanders was killed. Sanders' wallet was also missing and never found.

Dr. Sandra Elkins, a forensic pathologist who had performed the autopsy on Sanders, testified that the cause of his death was multiple gunshot wounds, one of which lacerated his femoral artery and caused him to bleed to death. Dr. Elkins found nine separate gunshot wounds to the victim's right leg, extending from the groin area of the upper thigh to just above the knee, which included both entrance and exit wounds. From the combination of entrance and exit wounds, Dr. Elkins deduced that the victim had actually been shot four or five times. A person with the victim's injuries, Dr. Elkins testified, could live from two to fifteen minutes and be conscious four to five minutes after suffering such a wound.

Based upon the proof summarized above, the jury found the defendant guilty of first degree premeditated murder, especially aggravated robbery, attempted first degree murder, and attempted aggravated robbery.

The trial proceeded to the sentencing phase on the conviction for first degree murder. The State presented two witnesses. Dr. Elkins again testified that someone with the victim's injury could live from two to fifteen minutes and be conscious up to four to five minutes. Since the victim's femoral nerve had only been bruised and not severed, and because the muscles and nerves of his right thigh had been completely destroyed, Dr. Elkins testified that the victim would have experienced pain from the wounds in his leg during the time he remained conscious.

The second State witness was the victim's mother, Vivian Lewis, a deaf mute who testified through an interpreter. She testified that her son was sweet and good and had never been in any trouble. She said that the victim's two small daughters, two-years-old and four-years-old at the time of trial, were "very, very worried" and wanted to see their father. Lewis also testified that her son's murder had left his family "very, very hurt."

The defense presented three witnesses: the defendant's mother, Marilyn Boyd; his maternal grandmother, Virginia Bland; and the defendant himself. The defendant had never known his father and was raised by his mother and grandmother, who both testified that he had turned himself into the police at their urging. The defendant had dropped out of high school in the eleventh grade, when he was suspended for being "disrespectful to a teacher." He had a juvenile record

beginning at the age of eleven, consisting of multiple assaults and batteries, car thefts, and at least one drug conviction. The defendant testified that he shot the victim because the victim ran back to his car as if he was "fixing to get his gun or something;" that he did not know why he and Darryl had followed the victim; that he had been drinking and the crime was a spur of the moment decision; and that the victim was shot several times because the automatic gun "kept on repeating shots." He expressed remorse and repeated that he was not trying to kill the victim: "[t]hat's why I shot him in the leg." The defendant also admitted that he carried a gun because he sold drugs and that he had been selling drugs on the night of the killing. During closing argument, counsel for the defendant stressed his youth, lack of education, and single parent upbringing.

Based on the proof, the jury determined that the State had proven the existence of one aggravating circumstance beyond a reasonable doubt: "[t]he murder was especially heinous, atrocious or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death." Tenn. Code Ann. § 39-13-204(I)(5) (1991 Repl. & 1996 Supp.). In addition, the jury found that the aggravating circumstance outweighed the mitigating circumstances beyond a reasonable doubt, and as a result, sentenced the defendant to death by electrocution. The trial court entered a judgment in accordance with the jury's verdict and the Court of Criminal Appeals affirmed.[5] After reviewing the record and considering the errors assigned

---

[5]In its opinion on the petition to rehear filed by the State, the Court of Criminal Appeals expressed doubt about its jurisdiction over the case, observing that one possible interpretation of Tenn. Code Ann. § 39-13-206(a)(1) (1996 Supp.) would divest the intermediate court of jurisdiction of a capital case immediately upon the filing of an opinion affirming the sentence of death. However, the better interpretation of the statute, which we adopt, is that the Court of Criminal Appeals retains jurisdiction to dispose of a timely filed petition for rehearing of a capital case in which the death sentence has been affirmed. See Tenn. R. App. P. 39.

by the defendant, we affirm the judgment of the trial court and Court of Criminal Appeals.

## SUFFICIENCY OF THE EVIDENCE

Relying upon State v. Brown, 836 S.W.2d 530 (Tenn. 1992), the defendant contends that the trial court and Court of Criminal Appeals erred in finding the evidence sufficient to establish premeditation and deliberation. He argues that the only proof of these elements is repeated gunshots.

A guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory. State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). A verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. This Court does not reweigh or reevaluate the evidence. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Nor may this Court substitute its inferences for those drawn by the trier of fact from circumstantial evidence. Liakas v. State, 199 Tenn. 298, 305, 286 S.W.2d 856, 859 (1956). Therefore, on appeal, the State is entitled to the strongest legitimate view of the trial evidence and all reasonable and legitimate inferences which may be drawn from the evidence. Consequently, in considering the defendant's claim that the evidence is not sufficient, we must determine, after reviewing the evidence in the light most favorable to the

State, whether any rational trier of fact could have found the defendant guilty of premeditated first degree murder beyond a reasonable doubt. Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Cazes, 875 S.W.2d 253 (Tenn. 1994).

At the time of the killing, first-degree murder was defined as an "intentional, premeditated and deliberate killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (1991). "Intentional" is defined as the "conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-106(18) (1991 Repl.). Premeditation, on the other hand, requires "the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-201(b)(2) (1991 Repl.). Finally, deliberation requires proof of a "cool purpose" that includes some period of reflection during which the mind is free from passion and excitement. Tenn. Code Ann. § 39-13-201(b)(1) (1991 Repl.); Brown, 836 S.W.2d at 539.

The elements of premeditation and deliberation are questions for the jury which may be established by proof of the circumstances surrounding the killing. Brown, 836 S.W.2d at 539. There are several factors which tend to support the existence of these elements which include: the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime, and calmness immediately after the killing. Brown, 836 S.W.2d at 541-42; State v. West, 844 S.W.2d 144, 148 (Tenn. 1992).

Considering the proof in this record in the light most favorable to the State, as we are required to do, we agree with the Court of Criminal Appeals that the evidence is sufficient to establish premeditation and deliberation. Contrary to the defendant's assertion, the existence of repeated gunshots to the victim is not the only evidence of premeditation and deliberation. Here, the defendant shot an unarmed victim after the victim had turned around and headed back towards his car. When the victim attempted to get away, the defendant followed him, at a rather slow pace, some 273 feet. During the chase, the defendant again shot the victim, consciously choosing to engage in the conduct. After being shot a second time, the victim sought refuge under a pickup truck. At that point, the victim was trapped and helpless. If, as the defendant claimed, he intended only to disable the victim, he would have ended the assault at that point. Instead, the defendant consciously chose to kneel down and shoot the unarmed victim at least two or three more times while he was underneath the pickup truck. Even assuming, as the defendant claimed, that the automatic weapon continued to fire after he had released the trigger, the proof in this case shows that, at a minimum, the defendant pulled the trigger on three separate occasions - once when the victim began to return to his car, once during the chase, and once while the victim tried to hide underneath the pickup truck. The jury logically could have concluded that the defendant had time to reflect upon and choose a course of action when he first fired his gun at the retreating victim, again during the casual chase which ensued, and again upon discovery of the victim under the pickup truck. These circumstances support a finding of premeditation and deliberation. After leaving the victim begging for help underneath the pickup truck, the defendant returned to Norman's car where he stood and observed the beating and robbery of Nugent. This fact illustrates calmness and dispassion. When Nugent broke away

-12-

and began to run, someone yelled that he had a gun, and the defendant shot Nugent twice. Once again, the defendant coolly responded to the situation by shooting another unarmed person. Thereafter, the defendant "dumped" the gun in an effort to conceal the crime and went to his girlfriend's house and fell asleep. Calmness immediately following a killing is evidence of a cool, dispassionate, premeditated murder. West, 844 S.W.2d at 148.

Clearly, the evidence in this record is sufficient to support the conclusion that the defendant, without passion or provocation and with a cool purpose, consciously engaged in the conduct which caused the victim's death after exercising judgment and reflection. Therefore, we conclude that the evidence in this record is sufficient to establish premeditation and deliberation.

---

### SUFFICIENCY OF EVIDENCE - AGGRAVATING CIRCUMSTANCE

Pursuant to Tenn. Code Ann. § 39-13-206(c)(1)(B)-(C) (1991 Repl. & 1996 Supp.), we have examined the evidence to determine whether it is sufficient to support the aggravating circumstance found by the jury and whether it is sufficient to support the jury's finding that the aggravating circumstance outweighed any mitigating circumstances beyond a reasonable doubt. We conclude that the evidence is clearly sufficient to support these findings.

The trial court correctly instructed the jury as to the definitions of the terms "heinous," "atrocious," and "cruel" in accordance with this Court's decision in State v. Williams, 690 S.W.2d 517, 529 (Tenn. 1985); see also State v. Odom, 928 S.W.2d 18, 26 (Tenn. 1996). Also in accordance with Williams, the trial court instructed the

-13-

jury that "torture" means "the infliction of severe physical or mental pain upon the victim while he or she remains alive and conscious." Id. The proof introduced by the State during the trial clearly established torture.[6] The defendant shot the victim once in the leg. The victim began bleeding profusely. Proof introduced at the sentencing hearing established that the bruising of the victim's femoral nerve would have caused great pain. Despite the bleeding from the wound and the resulting pain, the victim fled as fast as he could from his attackers. They pursued him for some 273 feet, almost 100 yards, shooting him again during the chase. No doubt terrified, the victim crawled under a truck seeking refuge, but the defendant was relentless. He knelt down and shot the victim several other times in the leg while the victim was underneath the truck, and then left the dying victim under the truck pleading for help. Sanders repeatedly called out, "Oh God, please help me," as the defendant and his friend ran away from the scene of the shooting. According to the medical testimony, the victim could have remained alive, conscious and in pain for four to five minutes after he was shot. According to the testimony of two eyewitnesses, the victim was alive, conscious, pleading for help, and attempting to crawl out from underneath the pickup truck for ten to fifteen minutes after they first heard gunshots. The facts and circumstances surrounding this murder are clearly sufficient to establish torture as that term has been defined in State v. Williams, supra, and to support the jury's finding that this murder was especially heinous, atrocious, or cruel, in that it involved torture or serious physical abuse beyond that necessary to produce death. Tenn. Code Ann. § 39-13-204(I)(5) (1991 Repl.). See also State v. Jones, 789 S.W.2d 545

---

[6] The specific finding of the jury in this case was that the murder was "1. cruel 2. torture." Indeed, the State did not rely upon the "serious physical abuse" prong of the statute. The failure of the verdict to repeat the language of the statute defining the aggravating circumstance does not invalidate the jury's findings. See State v. Henley, 774 S.W.2d 908, 917 (Tenn. 1989)(upholding verdict of "atrocious, cruel, torture"); see also State v. Teel, 793 S.W.2d 236, 250 (Tenn. 1990).

-14-

(Tenn. 1990); State v. Henley, 774 S.W.2d 908 (Tenn. 1989); State v. Taylor, 771 S.W.2d 387 (Tenn. 1989); State v. Sutton, 761 S.W.2d 763 (Tenn. 1988); State v. Porterfield, 746 S.W.2d 441 (Tenn. 1988); State v. Cooper, 718 S.W.2d 256 (Tenn. 1986); State v. McNish, 727 S.W.2d 490 (Tenn. 1987); State v. Campbell, 664 S.W.2d 281 (Tenn. 1984).

Moreover, the evidence is sufficient to support the jury's finding that the statutory aggravating circumstance so found outweighed mitigating circumstances beyond a reasonable doubt. In mitigation of the offense, the defendant relied upon his cooperation with police, his youth, lack of a prior adult record, lack of education, and absence of his father from the home. Although the proof shows that Bland eventually turned himself into the Memphis police, he did so only at the urging of his grandmother and mother and only after the police had instituted an intensive search for him. Moreover, while the defendant was young at the time of the murder, only nineteen, and had no adult criminal record, Bland admitted that he had an extensive juvenile record which began at age eleven and included multiple assaults and batteries. Though the defendant had not completed high school, he attended school through the eleventh grade and was suspended for being disrespectful to a teacher. There is no evidence that he suffered from a mental disease or defect. The weight given aggravating and mitigating circumstances is entirely within the province of the jury. The jury determines whether or not mitigation exists and whether the aggravating circumstances outweigh mitigation beyond a reasonable doubt. State v. Barber, 753 S.W.2d 659, 669 (Tenn. 1988). We are of the opinion that the evidence is sufficient to support the jury's finding that the aggravating circumstance outweighed mitigating circumstances beyond a reasonable doubt.

-15-

## PROPORTIONALITY REVIEW

The defendant next claims that his sentence is disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant. The defendant is therefore asserting that his sentence is comparatively disproportionate. Initially, we emphasize that statutory comparative proportionality review must be distinguished from traditional Eighth Amendment proportionality analysis, which is the "abstract evaluation of the appropriateness of a sentence for a particular crime." Pulley v. Harris, 465 U.S. 37, 42-43, 104 S.Ct. 871, 875, 79 L.Ed.2d 29 (1984). By contrast, comparative proportionality review "presumes that the death penalty is not disproportionate to the crime in the traditional sense. It purports to inquire instead whether the penalty is nonetheless unacceptable in a particular case because disproportionate to the punishment imposed on others convicted of the same crime." Id., 465 U.S. at 42-43, 104 S.Ct. at 875-76.

As a general principle, comparative proportionality review can be properly understood only if considered in light of its jurisprudential origins. We begin our review with a 1972 decision of the United States Supreme Court which, in effect, invalidated all of the death penalty statutes of the states and the federal government. Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). In Furman, the Court held that the Georgia statute was violative of the Eighth Amendment's prohibition against cruel and unusual punishment because the Georgia system left the decision of whether a defendant lived or died to the unfettered discretion of the jury. According to Furman, under the Georgia system, which was representative of the other statutes in effect throughout the country, a sentence of death was unconstitutional because "wantonly and . . . freakishly imposed" and cruel and

unusual "in the same way that being struck by lightning is cruel and unusual." Id.,
408 U.S. at 309-10, 92 S.Ct. at 2762-63 (Stewart, J., concurring).

Four years later, in Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d
859 (1976),[7] the Court again reviewed the Georgia capital sentencing statutes which
had been amended in response to Furman to limit jury discretion and avoid arbitrary
and inconsistent imposition of the death penalty. Among the features of the
amended statutory scheme was a requirement that the Georgia Supreme Court
"review every death sentence to determine whether it was imposed under the
influence of passion, prejudice, or any other arbitrary factor, whether the evidence
supports the findings of a statutory aggravating circumstance, and '[w]hether the
sentence of death is excessive or disproportionate to the penalty imposed in similar
cases, considering both the crime and the defendant.'" Id., 428 U.S. at 204, 96 S.Ct.
at 2939-40. After rejecting the argument that the death penalty is prohibited by the
Eighth Amendment regardless of the circumstances of the offense, the character of
the offender, or the procedure followed, the Court upheld the amended Georgia
statutory scheme, concluding that "the concerns expressed in Furman that the
penalty of death not be imposed in an arbitrary and capricious manner can be met
by a carefully drafted statute that ensures that the sentencing authority is given
adequate information and guidance." Id., 428 U.S. at 195, 96 S.Ct. at 2935-36. One
aspect of the Georgia statute cited with approval by the United States Supreme Court
in Gregg was the appellate review feature which was described as "a check against

_____

[7]On the same day that Gregg was decided, the United States Supreme Court also
approved the statutory capital sentencing schemes of Florida and Texas. See Proffitt v. Florida,
428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); Jurek v. Texas, 428 U.S. 262, 96 S.Ct. 2950,
49 L.Ed.2d 929 (1976).

-17-

the random or arbitrary imposition of the death penalty." Id., 428 U.S. at 206, 96 S.Ct. at 2940-41.

Responding to the United States Supreme Court decision in Gregg, supra, the Tennessee General Assembly, in 1977, enacted a capital sentencing scheme which contained a comparative proportionality review provision that was based upon the Georgia statute.[8] See David Raybin, "New Death Penalty Statute Enacted," Judicial Newsletter, University of Tennessee College of Law pp. 11-12 (May 1977). Because of the approval given such provisions in Gregg, at the time of its enactment, the comparative proportionality provision included in the Tennessee capital sentencing scheme was considered to be constitutionally required. See Judicial Newsletter at p. 11 ("These appellate review procedures appear to be constitutionally required to insure, at least on a statewide level, that the death penalty is not imposed in an arbitrary fashion.").[9] That view was commonly held until the United States

---

[8]In response to Furman, Tennessee enacted a capital sentencing scheme in 1973, Public Acts 1973, Ch. 192, § 2, which was held unconstitutional under Art. II, § 17 of the Tennessee Constitution because its provisions embraced more than one subject and not all of the subject matter was set forth in the caption. State v. Hailey, 505 S.W.2d 712 (Tenn. 1974). As a result, the General Assembly that same year amended the definition of first degree murder and provided a mandatory death penalty for all persons convicted of that offense or as an accessory before the fact of that crime. Public Acts 1974, Ch. 462. In Collins v. State, 550 S.W.2d 643 (Tenn. 1977), however, the 1974 statute was held unconstitutional under three United States Supreme Court decisions invalidating, as violative of the Eighth and Fourteenth Amendments, statutes prescribing a mandatory sentence of death upon conviction of first degree murder. See Woodson v. North Carolina, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976); Roberts v. Louisiana, 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976); Williams v. Oklahoma, 428 U.S. 907, 96 S.Ct. 3218, 49 L.Ed.2d 1215 (1976). Thereafter, on February 8, 1977, the Governor commuted the sentence of all death row prisoners to life imprisonment, and on April 11, 1977, the death penalty statute became effective when passed over the Governor's veto. See Miller v. State, 584 S.W.2d 758, 762-63 (1979). Although the capital sentencing scheme has been modified somewhat over the intervening twenty years, the 1977 enactment is the basis of the current capital sentencing statute. See e.g. Public Acts 1981, Ch. 33; Public Acts 1989, Ch. 591, and Public Acts 1990, Ch. 1038.

[9]This view was commonly held by other state legislatures as well. Those states adopting statutory provisions requiring comparative proportionality review include: **Alabama**, Ala. Code § 13A-5-53(b)(3); **Connecticut**, Conn. Gen. Stat. § 53a-46b(3); **Delaware**, Del. Code Ann. tit. II, § 4209(g); **Georgia**, Ga. Code Ann. § 17-10-35(c)(3); **Idaho**, Idaho Code § 19-2827(c); **Kentucky**, Ky. Rev. Stat. Ann. § 532.075(3); **Louisiana**, La. Code Crim. Pro. Ann. art. 905.9 and La. Sup. Ct.

Supreme Court explicitly rejected the idea that comparative proportionality review is constitutionally required. Pulley, 465 U.S. at 50-51, 104 S.Ct. at 879-80 ("There is . . . no basis in our cases for holding that comparative proportionality review by an appellate court is required in every case in which the death penalty is imposed and the defendant requests it."); see also Walton v. Arizona, 497 U.S. 639, 655-56, 110 S.Ct. 3047, 3058, 111 L.Ed.2d 511 (1990); McCleskey v. Kemp, 481 U.S. 279, 306-308, 107 S.Ct. 1756, 1774-75, 95 L.Ed.2d 262 (1987) (presumption that sentence not disproportionate where it is imposed under a system which furnishes sufficient guidance to the sentencer through constitutionally valid aggravating and mitigating circumstances, and a federal court does not review the conclusions of the state's highest court so long as the proportionality review was undertaken in good faith).[10] While important as an additional safeguard against arbitrary or capricious sentencing, comparative proportionality review is not constitutionally required.[11] Therefore, in

---

R. 28, Section 1; **Maryland**, Md. Code Ann. [Crim. Law] § 414(e); **Mississippi**, Miss. Code Ann. § 99-19-105(3); **Missouri**, Mo. Rev. Stat. § 565.035(3); **Montana**, Mont. Code Ann. § 46-18-310(3); **Nebraska**, Neb. Rev. Stat. § 29-2521.03; **Nevada**. Nev. Rev. Stat. § 177.055(2)(d); **New Hampshire**, N.H. Rev. Sat. Ann. § 630.5(XI); **New Jersey**, N.J. Rev. Stat. § 2C:11-3(e); **New Mexico**, N.M. Stat. Ann. § 31-20A-4(c); **New York**, N.Y. Crim. Proc. § 470.30(3); **North Carolina**, N.C. Gen. Stat. § 15A-2000(d); **Ohio**, Ohio Rev. Code Ann. 2929.05(A); **Oklahoma**, Okla. Stat. tit. 21, § 701.13(c)(3); **Pennsylvania**, 42 Pa. Cons. Stat. 9711(H); **South Carolina**, S.C. Code Ann. § 16-3-25(c); **South Dakota**, S.D. Codified Laws Ann. § 23A-27A-12; **Virginia**, Va. Code Ann. § 17-110.1; **Washington**, Wash. Rev. Code § 10-95-130(2); **Wyoming**, Wyo. Stat. § 6-4-103(d). Three other states, by judicial decision, required comparative proportionality review including: **Arkansas**, Sheridan v. State, 855 S.W.2d 772, 780 (Ark. 1993); **Arizona**, State v. Richmond, 560 P.2d 41 (Ariz. 1976); **Florida**, Brown v. Wainwright, 392 So.2d 1327, 1331 (Fla. 1981).

[10]The Tennessee statutory capital sentencing scheme has been repeatedly upheld against constitutional attack, and, from the raw numbers, appears to be performing its intended purpose of reserving the death sentence for the "worst of the bad." In 1996, approximately 492 persons were named in first degree murder indictments in this State. 102 persons were convicted of first degree murder in that year. Five death sentences were returned, with 33 individuals receiving a sentence of life imprisonment without the possibility of parole, while 64 individuals received a sentence of life imprisonment with the possibility of parole.

[11]Indeed, in the wake of Pulley, supra, nine of the twenty-nine other states which initially conducted comparative proportionality review have either repealed the statutory provisions or overruled court decisions mandating it. See, **Arkansas** Willett v. State, 911 S.W.2d 937, 945-46 (Ark. 1995) (stating that Arkansas Supreme Court will no longer conduct proportionality reviews); **Arizona**, State v. Salazar, 844 P.2d 566, 583-84 (Az. 1992) (stating that the Arizona Supreme Court

-19-

adopting an approach to comparative proportionality review, a state appellate court must evaluate the statutory language at issue and the legislative intent in light of the jurisprudential background of Furman and Gregg. See State v. Webb, 680 A.2d 147, 200 (Conn. 1996).

Despite the lack of any federal constitutional standard, there are two basic approaches to statutory comparative proportionality review: (1) the frequency method; and (2) the precedent-seeking method. Webb, 680 A.2d at 209; State v. Marshall, 613 A.2d 1059 (N.J. 1992). Both approaches share a common goal which is to determine whether a particular sentence is disproportionate to the sentences imposed for similar crimes and similar defendants. Id. While the goal is the same, the approaches are fundamentally different in principle and application. In general, the frequency method[12] employs a complicated statistical analysis that attempts and purports to quantify, with near mathematical precision, the various factors leading to

---

will discontinue proportionality reviews); **Connecticut**, 1995 Conn. Acts 16, §3(b) (Reg. Sess.); **Idaho**, 1994 Idaho Sess. Laws 127 (S.B. 1302); **Maryland**, 1992 Md. Laws 331 (H.B. 590); **Nevada**, 1985 Nev. Stat. 527; **Oklahoma**, 1985 Okla. Sess. Laws, Ch. 265, § 1; **Pennsylvania**, 1997 Pa.Legis.Serv. Act 1997-28, § 1 (S.B. 423); **Wyoming**, Wyo. Stat. § 6-4-103(d).

[12]No state has applied a "pure" frequency method approach when conducting comparative proportionality review. Although it appeared New Jersey would do so in Marshall, supra, that Court opted instead to utilize both the frequency method and the precedent-seeking method. State v. DiFrisco, 662 A.2d 442 (N.J. 1995). The New Jersey Supreme Court has acknowledged that it relies "more heavily" on precedent-seeking review than on frequency analysis, and it has explicitly refused to set an arbitrary numerical standard at which defendants "generally" receive the death penalty. Id. at 460. Although the Washington Supreme Court appears to utilize the frequency approach to some degree, by quantifying for comparison the number of aggravating circumstances, victims, and prior convictions, that Court recently stated:

> We have quantified those factors that are easily quantifiable in order to be as objective as possible. By this we do not suggest proportionality is a statistical task or can be reduced to numbers, but only that numbers can point to areas of concern. At its heart, proportionality review will always be a subjective judgment as to whether a particular death sentence fairly represents the values inherent in Washington's sentencing scheme for aggravated murder.

State v. Pirtle, 904 P.2d 245, 276 (Wash. 1995).

the imposition or nonimposition of the death penalty and the frequency with which the death penalty is imposed in certain circumstances. See e.g., Marshall, supra; State v. Pirtle, 904 P.2d 245 (Wash. 1995). This approach has been criticized as an unworkable attempt "to quantify the unquantifiable." See Webb, 680 A.2d at 209; see also State v. Ramsey, 864 S.W.2d 320, 327-28 (Mo. 1993) (en banc). By contrast, a reviewing court employing the precedent-seeking approach compares the case before it to other cases in which the defendants were convicted of the same or similar crimes by examining the facts of the crimes, the characteristics of the defendants, and the aggravating and mitigating factors involved. See e.g. Webb, supra; Tichnell v. State, 468 A.2d 1, 13-23 (Md. 1983).

Without explicitly adopting the nomenclature, this Court has applied the precedent-seeking approach for the past eighteen years. See e.g., State v. Barber, 753 S.W.2d 659, 665-66 (Tenn. 1988); State v. Cazes, 875 S.W.2d 253 (Tenn. 1994). The Tennessee statute was modeled after the Georgia scheme approved in Gregg. The frequency approach had not even surfaced within published death penalty jurisprudence in 1977 when our statute was enacted and it is inconsistent with the type of fact specific analysis employed by Georgia and described and approved by the United States Supreme Court in Gregg. There is no indication that our Legislature contemplated a complicated statistical inquiry when it enacted the statutory proportionality review provision in 1977. See Webb, 680 A.2d at 209. Moreover, the General Assembly has never amended the statute to eliminate or modify the precedent-seeking approach which has been utilized by this Court since the comparative review provision was enacted.

We are mindful that the purposes of comparative proportionality review are to eliminate the possibility that a person will be sentenced to death by the action of an aberrant jury and to guard against the capricious or random imposition of the death penalty.[13]  As we have previously stated, comparative review of capital cases insures rationality and consistency in the imposition of the death penalty.  Barber, 753 S.W.2d at 665-66; see also State v. Kandies, 467 S.E.2d 67, 86 (N.C. 1996).  In light of the jurisprudential background against which our statutory provision was adopted, combined with the General Assembly's use of the word "disproportionate," it is clear that our function in performing comparative review is not  to search for proof that a defendant's death sentence is perfectly symmetrical, but to identify and invalidate the aberrant death sentence.  Id.; State v. Groseclose, 615 S.W.2d 142, 150 (Tenn. 1981) (trial court reports are designed to prevent the arbitrary or capricious imposition of the death penalty); see also Webb, 680 A.2d at 211; State v. Bey, 645 A.2d 685 (N.J. 1994).  If the case, taken as a whole, is plainly lacking in circumstances consistent with those in similar cases in which the death penalty has been imposed, the sentence of death in the case being reviewed is disproportionate.  State v. Ramsey, 864 S.W.2d 320, 328 (Mo. banc 1993).[14]  Even if a defendant receives a death sentence when the circumstances of the offense are similar to those of an offense for which a defendant has received a life sentence, the death sentence is not disproportionate where the Court can discern some basis for the lesser sentence.  See  State v. Carter, 714 S.W.2d 241, 251 (Tenn. 1986).  Moreover, where there is

---

[13]Gregg, 428 U.S. at 206; 96 S.Ct. at 2940; State v. Welcome, 485 So.2d 1235, 1258 (La. 1983); Tichnell, 468 A.2d at 15; State v. McNeill, 485 S.E.2d 284, 289 (N.C. 1997); State v. Rhines, 548 N.W.2d 415, 457 (S.D. 1996); Pirtle, 904 P.2d at 276.

[14]Justice Reid singles out in his dissent the above quote from State v. Ramsey, and concludes that "applying that standard, the sentence of death in this case is disproportionate." He fails to cite the remainder of this paragraph. The full paragraph speaks for itself and does not support Justice Reid's conclusion.

no discernible basis for the difference in sentencing, the death sentence is not necessarily disproportionate. This Court is not required to determine that a sentence less than death was never imposed in a case with similar characteristics. On the contrary, our duty under the similarity standard is to assure that no abberant death sentence is affirmed. Webb, 680 A.2d at 203. "Since the proportionality requirement on review is intended to prevent caprice in the decision to inflict the [death] penalty, the isolated decision of a jury to afford mercy does not render unconstitutional death sentences imposed on defendants who were sentenced under a system that does not create a substantial risk of arbitrariness or caprice." Cf. Gregg, 428 U.S. at 203, 96 S.Ct. at 2939.

In our view, the precedent-seeking method effectively enables this Court to achieve the goal of comparative proportionality review -- identifying aberrant sentences. If a reviewing court allowed its comparative proportionality analysis to be governed by statistical and quantitative analysis, the concept of "individualized consideration" expounded in Lockett v. Ohio, 438 U.S. 586, 604-05, 98 S.Ct. 2954, 2964-65, 57 L.Ed.2d 973 (1978)(Burger, C.J., plurality opinion), would be frustrated. State v. Williams, 301 S.E.2d 355, 356 (N.C. 1983); State v. Copeland, 300 S.E.2d 63, 72 (S.C. 1982).

In performing our comparative proportionality function, we are guided by the language of the statute which provides that appellate courts reviewing capital cases should determine whether "[t]he sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and

the defendant." Tenn. Code Ann. § 39-13-206(c)(1)(D) (1991 Repl. & Supp. 1996).[15]

Though the statute itself is silent on the issue,[16] the universe from which we choose

the pool of "similar cases" for comparison includes "all cases in which the defendant

is convicted of first degree murder." Tenn. Sup. Ct. Rule 12.

For purposes of comparative proportionality review, we eliminate from the

"universe" and include in the more narrow "pool" for comparison only those cases in

which a capital sentencing hearing was actually conducted to determine whether the

sentence should be life imprisonment, life imprisonment without the possibility of

---

[15]Previously codified at Tenn. Code Ann. § 39-2-205(c)(4) (1982) and Tenn. Code Ann. § 39-2406(c)(4) (Supp. 1977).

[16]Some states, either by statute or judicial decision limit the pool for comparison to only cases in which a sentence of death has been imposed. See **Alabama**, Beck v. State, 396 So.2d 645, 664 (Ala. 1980); **Arkansas**, Sanders v. State, 878 S.W.2d 391, 400 (Ark. 1994); **Arizona**, State v. White, 815 P.2d. 869, 884 (Ariz. 1991); **Florida**, Williams v. State, 437 So.2d 133, 137 (Fla. 1983); **Kentucky**, Gall v. Commonwealth, 607 S.W.2d 97 (Ky. 1980); **Mississippi**, King v. State, 421 So.2d 1009 (Miss. 1982); **Nebraska**, State v. Palmer, 399 N.W.2d 706, 733 (Neb. 1986); **New Jersey**, N.J. Stat. Ann. § 2C:11-3; **Ohio**, State v. Steffen, 509 N.E.2d 383, 395 (Ohio 1987); **South Carolina**, State v. Copeland, 300 S.E.2d 63 (S.C. 1982). Other states include in the pool cases in which the State sought the death penalty and a sentencing hearing was held, regardless of the sentence imposed. See **Connecticut**, Practice Book § 4066A(b); **Delaware**, Flamer v. State, 490 A.2d 104, 139 (Del. 1983); **Maryland**, Tichnell, 468 A.2d at 13-23; **Missouri**, State v. Whitfield, 837 S.W.2d 503, 515 (Mo. 1992) (en banc); **Montana**, State v. Smith, 931 P.2d 1272, 1285 (Mont. 1996); **Nevada**, Biondi v. State, 699 P.2d 1062 (Nev. 1985); **New Mexico**, State v. Garcia, 664 P.2d 969 (N.M. 1983); **North Carolina**, Williams, 301 S.E.2d at 355; **Oklahoma**, Liles v. State, 702 P.2d. 1025, 1036 (Okla. Crim. App. 1985); **South Dakota**, Rhines, 548 N.W.2d at 455; **Virginia**, Jenkins v. Commonwealth, 423 S.E.2d 360, 371 (Va. 1992); **Washington**, Wash. Rev. Code Ann. § 10.95.130(2)(b). Finally, some states include in the pool all death-eligible homicide convictions or indictments. **Georgia**, Ga. Code Ann. § 17-10-37(a); **Idaho**, State v. Creech, 670 P.2d 463, 476 (Idaho 1983); **Louisiana**, State v. Martin, 376 So.2d 300, 312-13 (La. 1979); **New York**, N.Y. Jud. Law § 211-a (death-eligible indictments); **Pennsylvania**, Commonwealth v. Frey, 475 A.2d 700, 707 (Pa. 1984); **Wyoming**, Engberg v. State, 686 P.2d 541, 555 (Wyo. 1984). Of the twenty states which still require comparative review, eight limit the pool for comparison to cases in which a death sentence was imposed; eight consider cases in which a capital sentencing hearing was held regardless of the sentence imposed; and three include in the pool all death-eligible homicides. One other state, New Hampshire has not defined the pool for comparison because it has no death penalty cases, though it has a capital sentencing scheme. The United States Supreme Court has approved more limited "universes" than that provided by our Rule 12. See Gregg 428 U.S. at 205, n. 56, 96 S.Ct. at 2940, n. 56; Proffitt, 428 U.S. at 259, 96 S.Ct. at 2969-70.

-24-

parole, or death by electrocution, regardless of the sentence actually imposed.[17]
See Footnote 14, supra (listing other states with the same limitation).  "[B]ecause the
aim of proportionality review is to ascertain what other capital sentencing authorities
have done with similar capital murder offenses, the only cases that could be deemed
similar . . . are those in which imposition of the death penalty was properly before the
sentencing authority for determination."  Tichnell, 468 A.2d at 15-16; Whitfield, 837
S.W.2d at 515; Smith, 931 P.2d at 1285; Rhines, 548 N.W.2d at 455-56. Accord,
Flamer v. State, 490 A.2d at 139.

Selecting similar cases from the pool for comparison is not an exact science.
No two cases or defendants are precisely identical. Though consideration of the
aggravating and mitigating circumstances as revealed by the Rule 12 reports is a
crucial element of the process, we are not limited to only those cases in which exactly
the same aggravating circumstances have been found.  Barber, 753 S.W.2d at 667;
State v. Brimmer, 876 S.W.2d 75, 84 (Tenn. 1994).  In choosing and comparing
similar cases, this Court considers many variables which are not readily subject to

---

[17]We do not include in the pool for comparison first degree murder cases in which the State did not seek the death penalty or a sentence other than death was agreed upon as part of a plea bargaining agreement.  See Webb, 680 A.2d at 211, Whitfield, 837 S.W.2d at 515 (including in the pool for comparison first degree murder cases in which the State did not seek the death penalty or agree upon a sentence less than death without a hearing amounts to implicitly reviewing prosecutorial discretion which is generally not subject to judicial review).  Under current law a sentencing hearing may be conducted to determine whether the sentence should be life imprisonment or life imprisonment without the possibility of parole, even if the State does not seek the death penalty.  Tenn. Code Ann. § 39-13-204(a) (1996 Supp.)  Under prior law, a penalty hearing was held only if the State sought the death penalty. We include in the pool for comparison only those first degree murder cases in which the State seeks the death penalty and a sentencing hearing is held.  Of course, the decision to prosecute or seek the death penalty may not be deliberately based upon an impermissible consideration "such as race, religion or other arbitrary classification." Oyler v. Boles, 368 U.S. 448, 456, 82 S.Ct. 501, 506, 7 L.Ed.2d 446 (1962).  By this decision, defendants are in no way precluded from relying upon and utilizing the entire "universe" of first degree murder cases when attempting to establish a claim for selective prosecution under the Equal Protection Clause, see Wayte v. United States, 470 U.S. 598, 608, 105 S.Ct. 1524, 1531, 84 L.Ed.2d 547 (1985).

complete enumeration and definition.   Barber, 753 S.W.2d at 665; Williams, 301 S.E.2d at 355.  This Court has not previously attempted to explicitly enumerate factors, other than aggravating and mitigating circumstances, which are relevant to identifying similar cases and conducting  proportionality review.  However, clearly discernible from a review of the comparative proportionality discussions contained in our prior decisions are several other factors relevant to the process of identification and comparison of similar cases which include: (1) the means of death; (2) the manner of death (e.g., violent, torturous, etc.); (3) the motivation for the killing; (4) the place of death; (5) the similarity of the victims' circumstances including age, physical and mental conditions, and the victims' treatment during the killing; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effects on nondecedent victims.   See Barber, supra; see also State v. Hodges, 944 S.W.2d 346 (Tenn. 1997); State v. Bush, 942 S.W.2d 489 (Tenn. 1997); State v. Smith, 893 S.W.2d 908 (Tenn. 1994); State v. Nichols, 877 S.W.2d 722 (Tenn. 1994); Brimmer, supra; Cazes, supra; State v. Smith, 868 S.W.2d 561 (Tenn. 1993); State v. Howell, 868 S.W.2d 238 (Tenn. 1993); State v. Tran, 864 S.W.2d 465 (Tenn. 1993); State v. Caughron, 855 S.W.2d 526 (Tenn. 1993); State v. Harris, 839 S.W.2d 54 (Tenn. 1992); State v. Black, 815 S.W.2d 166 (Tenn. 1991). Compare Marshall, 613 A.2d at 1083.

Also evident from a reading of our prior cases are several criteria relevant to a comparison of the characteristics of defendants which include: (1) the defendant's prior criminal record or prior criminal activity; (2) the defendant's age, race, and gender; (3) the defendant's mental, emotional or physical condition; (4) the

-26-

defendant's involvement or role in the murder; (5) the defendant's cooperation with authorities; (6) the defendant's remorse; (7) the defendant's knowledge of helplessness of victim(s); (8) the defendant's capacity for rehabilitation. Id.; see also Tenn. Sup. Ct. Rule 12, Report of Trial Judge in Capital Cases. While by no means an exhaustive list, examination and consideration of these and other salient factors allows this Court to identify similar cases and determine whether the sentence of death in the case under review should be invalidated as disproportionate.

To assist this Court in fulfilling our statutory duty, the State and the defendant in each case must fully brief the issue by specifically identifying those similar cases relevant to the comparative proportionality inquiry.[18] When addressing proportionality review, the briefs of the parties shall contain a section setting forth the nature and circumstances of the crimes that are claimed to be similar to that of which the defendant has been convicted, including the statutory aggravating circumstances found by the jury and the evidence of mitigating circumstances. In addition, the parties shall include in the section a discussion of the character and record of the defendants involved in the crimes, to the extent ascertainable from the Rule 12 reports, appellate court decisions, or records of the trials and sentencing hearings in those cases.[19]

---

[18]Presently we locate similar cases for comparative proportionality review by using traditional research methods and by reviewing the more than five hundred Rule 12 reports on file in the Clerk's office in Nashville. We are in the process of selecting the specific criteria to be used in the preparation of a Tennessee CD-Rom death penalty database which will be used by this Court and accessible to the litigants.

[19]Cf. Webb, 680 A.2d 207, n. 75; Section 4, La.Sup. Ct. R. 905.9.1 (requiring the prosecution and defense to file a "sentence review memoranda" addressing the propriety of the sentence and discussing each first degree murder case in the district in which the sentence was imposed, along with a synopsis of the facts about the crime and the defendant in the case on appeal).

Comparative proportionality review is not a rigid, objective test. Cazes, 875 S.W.2d at 270. In conducting proportionality review, we do not attempt to employ mathematical or scientific techniques. Williams, 301 S.E.2d at 355. In evaluating the comparative proportionality of the sentence in light of the factors delineated above, a reviewing court must also rely upon the experienced judgment and intuition of its own members. Ramsey, 864 S.W.2d at 327-28; State v. East, 481 S.E.2d 652, 668 (N.C. 1997); Williams, 301 S.E.2d at 356; see also Marshall, 613 A.2d at 1075. As previously explained, the sentence of death is not disproportionate, unless, the case taken as a whole is plainly lacking in circumstances consistent with those in cases where the death penalty has been imposed.

In this case, Justice Reid agrees that the proof shows premeditation and torture and that the evidence supports the jury's finding that the aggravating circumstance outweighs mitigating circumstances beyond a reasonable doubt, but he concludes that the sentence of death is disproportionate, stating that "the proof does not show this defendant to possess the characteristics most repulsive to society's sense of decency, and most destructive to the very fabric of society." Since Justice Reid does not enumerate the characteristics which are most repulsive and destructive to society, we can only assume that he has utilized his own subjective judgment to make the determination. In our view, jurors are better equipped to decide, in the first instance, whether a particular defendant should receive the death penalty. The appellate task under § 206(c)(1)(D) is to compare similar cases, not to gauge, in isolation, the culpability of a specific defendant or the heinousness of a particular crime. See Webb, 680 A.2d at 204. Our role in conducting comparative

proportionality review is not to second-guess the jury's decision, but to identify and invalidate aberrant death sentences.

As a result of this fundamental disagreement about the role of this Court, Justice Reid, beginning in State v. Harris, 839 S.W.2d 54, 84-85 (Tenn. 1992) (C.J. Reid, dissenting), has repeatedly charged the majority with failing "to articulate and apply a standard for comparative review. . ."  However, as in the present dissent, in Harris, Justice Reid did not articulate a proposed standard nor offer any constructive advice to the majority on a methodology to correct the alleged error. This trend of criticizing the majority's comparative proportionality review analysis, while at the same time offering no specific suggestions for improvement has continued over the intervening five years.[20]

Even in the three prior direct appeal decisions of this Court where Justice Reid has agreed that the sentence of death is not disproportionate, see Bush, 942 S.W.2d at 527; Smith, 868 S.W.2d at 585; Howell, 868 S.W.2d at 271, Justice Reid has provided no express guidance as to the objective criteria and structured analysis he

[20]See State v. Middlebrooks, 840 S.W.2d 317, 354-55 (Tenn. 1992)(Reid, C.J., concurring and dissenting); State v. Van Tran, 864 S.W.2d 465, 485 (Tenn. 1993) (Reid, C.J., concurring and dissenting); State v. Howell, 868 S.W.2d 238, 271 (Tenn. 1993)(Reid, C.J., concurring); State v. Smith, 868 S.W.2d 561, 585 (Tenn. 1993) (Reid, C.J., concurring); State v. Hurley, 876 S.W.2d 57, 71 (Tenn. 1993) (Reid, C.J., dissenting); State v. Cazes, 875 S.W.2d 253, 272 (Reid, C.J., dissenting); State v. Nichols, 877 S.W.2d 722, 744 (Tenn. 1994) (Reid, C.J., dissenting); State v. Smith, 893 S.W.2d 908, 932 (Tenn. 1994) (Reid, J., concurring and dissenting); State v. Bush, 942 S.W.2d 489, 527 (Tenn. 1997) (Reid, J., concurring); State v. Hodges, 944 S.W.2d 346, 362 (Tenn. 1997) (Reid, J., dissenting). The basis for Justice Reid's prior assertion that it is not possible to articulate an alternative approach for comparative review in a dissenting opinion is not clear. Howell, 868 S.W.2d at 272 (Reid, C.J., concurring) ("An adequate structure for comparative proportionality review cannot be set forth in a dissent.") Jurists in other states have taken on the task. See e.g. State v. Rhines, 548 N.W.2d 415, 461 (S.D. 1996) (Amundson, J., dissenting); State v. Brett, 892 P.2d 29, 71 (Wash. 1995) (Utter, J., dissenting); State v. Lord, 822 P.2d 177, 228 (Wash. 1991) (Utter and Smith, JJ., dissenting); State v. Jeffries 717 P.2d 722, 731 (Wash. 1986) (Utter, J., dissenting). Indeed, many majority decisions actually begin as dissenting opinions.

employed to conclude that the sentence of death was not disproportionate. In fact, the explanations for the conclusion in Howell, Smith, and Bush that the sentence is not disproportionate appear to be well-written explanations of how the facts surrounding the commission of the offense demonstrate the rationality of the sentence imposed, similar to the analysis which consistently has been employed by a majority of this Court and often criticized by Justice Reid. One distinction from a majority discussion of comparative proportionality review is apparent, however. The prior concurring opinions do not discuss or even cite a single similar first degree murder case, considered in comparison, which supports the finding of proportionality. See Bush, 942 S.W.2d at 527; Smith, 868 S.W.2d at 585; Howell, 868 S.W.2d at 272-73. Likewise, in those prior cases in which Justice Reid has found the sentence of death to be disproportionate, he has articulated no objective criteria or framework for analysis, nor has he cited or discussed similar first degree murder cases to support the finding. See e.g., Hodges, 944 S.W.2d at 346; Nichols, 877 S.W.2d at 744; Cazes, 875 S.W.2d at 272.

In this case, a majority of this Court has carefully articulated many factors relevant to comparative proportionality review, and engaged in a lengthy discussion of its history and purpose. Justice Reid continues to characterize our prior discussions of comparative proportionality review as "conclusory" and "perfunctory." Without the benefit of specific suggestions or guidance,[21] however, the analysis

---

[21]As is stated in footnote 1 of Justice Reid's dissenting opinion, the discussion of proportionality review in this opinion was revised and expanded after the initial drafts of the dissenting opinions were received. The expansion primarily was a response to Justice Reid's dissenting opinion. We note that, as a result of our response, Justice Reid's dissenting opinion was revised and expanded.

employed by the majority in this case has unaccountably gained Justice Reid's guarded approval.[22]

In fact, Justice Reid applies the factors enumerated by the majority in determining that the sentence is disproportionate. However, in applying the analysis, Justice Reid considers specific facts in isolation and fails to recognize that the factors are to be applied in the context of the circumstances of the offense. For example, Justice Reid states that the "means of death was a handgun, undoubtedly the most commonly used instrument of homicide. Use of this weapon does not weigh for or against culpability." Justice Reid fails to mention anywhere in his analysis that the gunshot wounds causing death were inflicted during the course of a chase in which the unarmed, injured victim fled for his life. The other factors relied upon by Justice Reid in support of his conclusion are also suspect. Particularly bothersome is Justice Reid's statement that "the victim could reasonably expect the possibility of violence" because the "place of death was the parking lot of an apartment complex in South Memphis, a location at which unlawful activity, including drug dealing, dice games, robbery, assault and public drunkenness, was not unexpected." A law abiding citizen is free to travel anywhere he or she chooses. Where, as here, a citizen is randomly murdered in a high crime area and a perpetrator is convicted and sentenced to death, the citizen's decision to travel into the neighborhood has <u>no</u> bearing on whether the death penalty is disproportionate. Also troublesome is Justice Reid's observation that the defendant had no adult criminal record. Considering the defendant's extensive

---

[22]**Justice Reid states: "The proportionality procedure outlined by the majority in this case answers many of the problems raised in those prior decisions. The majority sets a course which could develop into a procedure which complies with the statute and the constitutions."**

juvenile record and that he was nineteen-years-old at the time of this offense, his lack of a criminal adult record has little relevance. Finally, Justice Reid's assertion that the defendant has a capacity for rehabilitation is completely without support in the record.

For the first time in a dissenting or concurring opinion Justice Reid cites and discusses three other cases to support his finding. However, the State did not seek the death penalty in two of the cases. Therefore, they are not similar cases for comparative proportionality review. With respect to the third case, the State sought the death penalty, but the defendant was sentenced to life imprisonment without the possibility of parole. Though the details of the case are not clear from Justice Reid's opinion, we emphasize that the isolated decision of the sentencer to afford mercy does not render the death sentence in this case disproportionate. In sum, Justice Reid's analysis does not demonstrate that this case, taken as a whole, is plainly lacking in circumstances consistent with those cases in which the death penalty has been imposed.

Application of the principles of comparative proportionality review convinces us that the sentence of death in this case is neither excessive nor disproportionate to the penalty imposed in similar cases considering the nature of the crime and the defendant. Tenn. Code Ann. § 39-13-206(c)(1)(D) (1991 Repl. & 1996 Supp.). We have studied, compared, and analyzed cases and conducted a meaningful proportionality review as outlined herein and in Barber, 753 S.W.2d at 663-68. We have made an independent, conscientious, and thorough review of this case, as we have in every other capital case which has come before this Court over the past

-32-

eighteen years.  As a result of that review, we are of the opinion that the premeditated killing of this victim warrants imposition of the death penalty.

Without provocation or explanation, the defendant shot an unresisting, retreating victim and then chased the injured man some 91 yards, shooting him once more during the course of the chase.  The defendant was not deterred when the severely injured victim sought refuge under a pickup truck; instead, he knelt down and shot the helpless man several more times.  The defendant ignored the victim's pleas for help and left him dying under the pickup truck.  The victim remained alive, conscious, and in pain for at least three to four minutes, and perhaps for as long as ten or fifteen minutes according to the testimony of eyewitnesses. Unaffected by the exceptional cruelty of his actions toward Terry Sanders, the defendant returned to the scene of the ongoing robbery, watched the group of men drag Nugent from the car, and did not hesitate to shoot Nugent twice when he tried to escape. When the robbery was completed the defendant disposed of the gun he had used and went to his girlfriend's apartment and slept.  The defendant described the shooting as a spur of the moment decision.  He said that he had been drinking and selling drugs prior to the shooting.  Though young when the murder was committed, only nineteen years old, and lacking a  prior adult criminal record, the defendant had a criminal history which dated back eight years and included numerous assaults and batteries.

The defendant argues that  the death penalty is disproportionate in this case because this Court has generally affirmed only those death sentences imposed for more "atrocious" murders.  While it is true that this Court has reviewed and affirmed the death penalty in cases involving more atrocious killings than the present crime,

this fact does not invalidate as disproportionate the penalty imposed in this case. Barber, 753 S.W.2d at 664-65. Moreover, as we have previously recognized, the fact that there are cases in which a life sentence has been given for murders that were also perhaps "more atrocious" than the murder in this case does not mean the death penalty is disproportionate in this case. Barber, 753 S.W.2d at 664-65 (citing and discussing cases). In conducting our review in this case, we have certainly found examples of more atrocious killings in which the jury declined to impose the death penalty.[23]

For instance in State v. Jack Jay North, No. 02C01-9512-CC-00369 (Tenn. Crim. App., at Jackson, Dec. 12, 1996), app. denied (Tenn. 1997), the defendant and a co-defendant entered the home of the forty-five year old victim in the early morning hours and shot the victim multiple times using a single shot sawed-off shotgun. The first shot was to the victim's arm and occurred in the living room. The victim then fled into the bathroom and was shot two times more as he lay on the floor begging the defendants to spare his life. The cause of death was a gunshot wound to the victim's head. Both North and his co-defendant admitted to being at the scene. However, both denied being the trigger man and each blamed the other person for planning and instigating the killing. The proof showed that the defendants were engaged in gang activity and committed the murder to prove their worthiness to other gang members. Neither North nor his co-defendant were acquainted with the victim, but there was some proof that North's mother had socialized with the victim during

_____

[23]As we stated in Barber, a comparative proportionality review is conducted by this Court in all death penalty cases. Id., 753 S.W.2d at 668, n. 5. Though we do not always include citations to or discussions of other first degree murder cases in which the State sought the death penalty and the defendant received a life sentence, this Court always considers those cases when conducting comparative proportionality review.

a time period when North was living with his father. North was twenty years old at the time of the killing. Though he did not graduate from high school, North had received a GED. North had a prior conviction for burglary. In the course of the investigation, North gave conflicting statements to the police, initially denying any involvement in the killing. According to the trial judge, North testified both at the trial and at sentencing in a "tearful, emotional manner." The jury found North guilty of first degree premeditated murder and also found that the State had proven the existence of three aggravating circumstances[24] beyond a reasonable doubt, including the circumstance returned by the jury in this case, that "[t]he murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death." Tenn. Code Ann. § 39-13-204 (i)(5) (1991 Repl.). However, the jury declined to impose the death penalty, returning instead a sentence of life imprisonment without the possibility of parole. The jury's decision to impose a sentence less than death on North, even though the circumstances of the crime reveal, in the words of the trial judge, that he was "a cold, callous person with absolutely no regard for human life," does not render Bland's sentence disproportionate. Cf. Gregg, supra, 428 U.S. at 203, 96 S.Ct. at 2939.

In conducting our review, we also have reviewed other cases bearing similarities to the circumstances of this crime and the character of this defendant, in which the defendants received a life sentence. For example, in State v. James

---

[24]The jury also found that "[t]he murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another;" and that "[t]he murder was committed while the defendant was engaged in committing, or was an accomplice in the commission of, or was attempting to commit, or was fleeing after committing or attempting to commit, any first degree murder, arson, rape, robbery, burglary, larceny, kidnapping, aircraft piracy, or unlawful throwing, placing or discharging of a destructive device or bomb." Tenn. Code Ann. § 39-13-204 (i)(6) & (7) (1991 & Supp. 1996).

Morning Craft, Jr., and Lewis Moorlet, C.C.A. No. 31, (Tenn. Crim. App., at Jackson, Mar. 8, 1989), app. denied (Tenn. 1989), the seventy year old victim, owner and operator of a liquor store in Memphis, closed his business at 11 p.m. and went to his car.  Finding a tire flat, he drove the car from the parking lot to the front of the store to change the tire. Craft, along with several other persons, helped the victim change the tire, and when the task was nearly completed, the victim was shot three times. Craft was observed running from the scene with the wounded victim firing a gun at him.  The victim died from the gunshot wounds a short time later, one of which severed his aorta.  The proof showed that Craft and Moorlet had discussed robbing the victim shortly before the crime was committed.  Craft had named Moorlet as the triggerman to several witnesses that testified for the State.  The jury found both Craft and Moorlet guilty of first degree murder committed in the perpetration of a robbery. The State relied upon only the felony murder aggravating circumstance at the sentencing hearing.  Craft, twenty at the time the offense was committed, had a low IQ and only a seventh grade education.  The trial judge characterized Craft as "easily led."  Three years earlier, Craft had been convicted of burglary.  Moorlet had a twelfth grade education and no prior criminal record.  Though his IQ was listed as not known by the trial judge, his conduct during the trial was described as "excellent."  There was no evidence of drug or alcohol influence in the killing.  Considering the proof, the jury declined to impose the death penalty and instead imposed a life sentence upon each defendant. Unlike this case, there was no evidence that the murder committed by Craft and Moorlet involved torture.  Unlike the unexplained, senseless murder committed by Bland, the murder committed by Craft and Moorlet occurred during the perpetration of a spur of the moment robbery.  Though the killing was certainly reprehensible, it was not an act of complete random violence as was the killing in this

case. Despite Bland's assertions that he decided to shoot Sanders on the spur of the moment, the assault upon the helpless victim continued for sometime and covered some distance. The assault by Craft and Moorlet ended quickly and the victim was not defenseless. One of the persons who had been helping the victim change the flat tire testified for the State against Craft and Moorlet. He said when the task was nearly completed, he began to walk away, leaving Craft and the victim behind tightening the lug bolts. After taking only 15 or 20 steps, the witness heard three shots and turned to see the wounded victim firing a gun at a fleeing Craft. Clearly, the manner of the killing and the motive for the murder committed by Craft and Moorlet are distinguishable and support the lesser sentence given.

Likewise, in State v. Horace Jones, C.C.A. No. 117, (Tenn. Crim. App., at Jackson, Dec. 4, 1980), app. denied (Tenn. 1981), the jury imposed a life sentence in a case with facts somewhat similar to the instant case. There, the forty-one year old victim was in a pool hall in Memphis when the defendant came in and shot him three times. The victim fell to the floor, and as he lay there face down, the defendant again pulled the trigger, but the gun misfired. The defendant fired the gun two more times and then reloaded it. The victim got up from the floor and ran to a room in the back of the establishment where he broke a window with a cue stick in an attempt to escape the defendant's assaults. When the victim ran towards the back of the pool hall, the witnesses present ran outside, but then heard three more shots. When they returned inside, the victim was deceased. Over a month later, the police apprehended the defendant in an apartment where he was hiding in a closet. At trial, the defense offered proof to show that the victim had been looking for the defendant during the months before the murder and intended to harm him because of a dispute

over a "crap game." The case proceeded to a sentencing hearing at which the defense offered expert testimony that the defendant could be rehabilitated and would profit from participation in a long term psychotherapy counseling group. Other mitigating circumstances relied upon by the defendant included victim participation, moral justification, and extreme emotional disturbance. The defendant was twenty-four at the time the offense was committed. Based upon the proof, the jury declined to impose the death penalty and returned a sentence of life imprisonment. Jones, unlike the defendant in this case, offered proof of his capacity for rehabilitation. Proof was also offered to show that the victim and Jones were acquainted and that the victim had been threatening Jones. While certainly no justification for the murder, it is a circumstance which reflects upon the character of the defendant. In contrast, the victim in this case was a stranger to the defendant and posed no threat when he asked simply "what's up?" Although the circumstances of the two murders are somewhat similar, the mitigation proof offered, and the relationship between the defendant and the victim explain the lesser sentence given Jones.

Based upon our review, we conclude that the following cases in which the death penalty has been imposed have many similarities with this case. In State v. Van Tran, 864 S.W.2d 465 (Tenn. 1993), this Court affirmed the death sentence of a nineteen year old defendant who, after shooting another victim, killed a seventy-four year old woman during the course of a robbery. As in this case, the victim had already been shot and was lying on the floor. Without provocation or explanation, Van Tran, like the defendant in this case, put a gun to the back of the unresisting and helpless victim's head and pulled the trigger. Van Tran was born in Viet Nam, the son of an American soldier who was killed in the war. As in this case, Van Tran had

grown up without his father, and had little education. Along with his mother, Van Tran was resettled in Memphis by a Catholic relief agency and attended school for only a short time before dropping out. Van Tran had a good employment record, and he had no prior criminal record. In addition, he cooperated with the authorities and expressed remorse for the killings. As in this case, the jury returned a single aggravating circumstance--the murder was especially heinous, atrocious, or cruel in that it involved depravity of mind. Tenn. Code Ann. § 39-2-203(i) (1982) (repealed). Finding that the evidence supported this aggravating circumstance and that there were no mitigating circumstances sufficiently substantial to outweigh the statutory aggravating circumstance, the jury sentenced Van Tran to death.

In State v. McNish, 727 S.W.2d 490 (Tenn. 1987), the victim, a seventy year old widow, was beaten about the face and head with a glass flower vase by the defendant. The victim was alive when she was found, but died a short time later. As in this case, McNish was young, twenty-nine, when he committed the offense. He had no prior criminal record. Previously, McNish had sustained head injuries in an automobile accident and was using prescription drugs heavily to combat headaches. Similar to Bland, who said he had been drinking when he killed Terry Sanders, McNish had been using drugs when he committed the murder. As in this case, the jury imposed the death sentence upon finding a single aggravating circumstance -- that the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind. Tenn. Code Ann. § 39-2-203(i)(5) (1982) (repealed).

In State v. Cooper, 718 S.W.2d 256 (Tenn. 1986), the defendant, age thirty-three, shot his estranged wife four times while she was trapped inside a glass and

brick cashier's booth. As did Bland, Cooper shot an unarmed, helpless victim without provocation. Also like Bland, Cooper did not shoot his wife four times in rapid succession. The victim in Cooper, as in this case, had time to contemplate her fate. Cooper shot once, walked away, then turned back and resumed firing at her. The jury imposed the death penalty, finding, as in this case, that the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind. Tenn. Code Ann. § 39-2-203(i)(5) (1982) (repealed).

In State v. Henley, 774 S.W.2d 908 (Tenn. 1989), the jury imposed the death penalty after finding, as in this case, that the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind. Tenn. Code Ann. § 39-2-203(i)(5) (1982) (repealed). Like Bland, Henley had been drinking and taking drugs on the day of the murder. Henley forced the victims, a married couple with whom he was acquainted, from the road to their house at gunpoint, demanding money. When the victims attempted to comply, Henley refused to take the money, and without provocation, shot the husband and then the wife. When the helpless, unresisting wife began moaning, Henley, like Bland in this case, shot her two more times. Later, Henley poured gasoline on her body and set the house on fire. Though the husband died from the gunshot wound, the wife died from burns and smoke inhalation.

In Barber, supra, the defendant without provocation, struck the helpless and unresisting seventy-five year old victim five times in the head with a crescent wrench. The victim in Barber tried to protect herself by fending off the blows with her hands. Terry Sanders, the victim in this case, tried to protect himself, fleeing from the assault

and seeking refuge underneath the truck. Barber was twenty-nine years old when he committed the murder. As mitigation, he relied upon his capacity for rehabilitation and, like Bland, his youth. As in this case, the jury found that the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind. Tenn. Code Ann. § 39-2-203(i)(5) (1982) (Repealed). In addition, the jury determined that the murder was committed during the course of a felony. See Barber v. State, 889 S.W.2d 185, 189-90 (Tenn. 1994) (concluding that the jury's consideration of felony-murder aggravating circumstance was harmless error).

Finally, though the jury in State v. Taylor, 771 S.W.2d 387 (Tenn. 1989) found three aggravating circumstances[25] in addition to finding that the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind, the circumstances of the offense and the character of the defendant in that case bear similarities to the circumstances of this killing and the character of this defendant. While incarcerated, Taylor attacked a guard with a hand-made knife. As in this case, the attack was without provocation. The victim fled down the hall, but was pursued by the defendant. Though the victim pled for mercy, the defendant continued with the assault. Eventually, the defendant ended the assault, leaving the victim alive and conscious, but severely wounded. Blinded by the assault, but conscious, the victim called out in pain to other prison inmates until he was removed to the hospital. As was Bland, Taylor was calm after the killing, returning to his cell, concealing the weapon, and changing clothes. The victim died forty minutes later from internal bleeding. Like Bland, Taylor relied upon his youth as mitigation of the offense: he

---

[25]The jury found that the defendant had committed prior violent felonies, that the defendant was in lawful confinement when he committed the murder, and that the victim was a corrections employee. Tenn. Code Ann. § 39-2-23(i)(2),(8) & (9) (1982) (repealed).

was twenty-one when he committed the murder. Also like Bland, Taylor had a juvenile record.

As stated earlier, though no two cases are identical, the above six cases have many similarities with Bland. In each case, the defendant assaulted an unresisting and defenseless victim without provocation or explanation. In each case multiple wounds were inflicted upon the victim, causing pain and suffering. Like Terry Sanders, the victims in at least two of the cases, Cooper and Taylor, were trapped and unable to get away from the defendant's assault. Like Bland, two of the defendants were very young[26] when the offense was committed – nineteen and twenty-one. Also like Bland, two of the defendants had been drinking or using drugs on the day of the murder. After reviewing the cases discussed above, and many other cases not herein described, we are of the opinion that the penalty imposed by the jury in this case is not disproportionate to the penalty imposed for similar crimes.

## CONCLUSION

In accordance with the mandate of Tenn. Code Ann. § 39-13-206(c)(1)(A) & (D) (1991 Repl. & 1996 Supp.), and the principles previously discussed, we have considered the entire record in this cause and find that the sentence of death was not imposed in an arbitrary fashion; that the evidence supports, as previously discussed, the jury's findings of the statutory aggravating circumstance and that the evidence supports the jury's finding that the aggravating circumstance outweighed mitigating

[26]This Court has reviewed 116 capital cases since 1977 involving 110 defendants. Of the 110, at least 46 were between the ages of 19 and 25 when the offense was committed. At least 9 were 19 years old when the offense was committed.

–42–

circumstances beyond a reasonable doubt. Tenn. Code Ann. § 39-13-206(c)(1)(A)-(C) (1991 Repl. & 1996 Supp.). We have considered the defendant's assignments of error and have determined that none have merit. With respect to issues not specifically addressed herein, we affirm the decision of the Court of Criminal Appeals, authored by Judge Paul G. Summers and joined in by Judge David H. Welles and Judge William M. Barker. The defendant's sentence of death by electrocution is affirmed. The sentence of death will be carried out as provided by law on the 6th day of April 1998, unless otherwise ordered by this Court or other proper authorities.

_____
Frank F. Drowota, III,
Justice


**Concur:**
Anderson, C. J. and Holder, J.

Reid, J. - separate concurring and dissenting opinion.

Birch, J. - separate concurring and dissenting opinion.