IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs July 10, 2007

## STATE OF TENNESSEE v. DONTAE LAMONT BROWN

**Direct Appeal from the Circuit Court for Lauderdale County
No. 7923    Joseph H. Walker, III, Judge**

---

**No. W2006-01800-CCA-R3-CD  - Filed October 2, 2007**

---

A Lauderdale County Circuit Court jury convicted the appellant, Dontae Lamont Brown, of attempted first degree murder and aggravated assault.  The trial court sentenced him to thirty-two years and eight years, respectively, and merged the convictions.  On appeal, the appellant contends that (1) the evidence is insufficient to support the convictions, (2) the trial court erred by giving the jury a flight instruction, and (3) the trial court improperly enhanced his sentences.  Based upon the record and the parties' briefs, we affirm the jury's guilty verdicts and the appellant's thirty-two-year sentence for attempted murder.  However, given that the trial court merged the aggravated assault conviction into the attempted murder conviction, the court should have entered only one judgment of conviction.  Therefore, we remand the case for the trial court to enter a single judgment reflecting the merger of the convictions.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court are Affirmed as Modified and Case Remanded.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which DAVID G. HAYES and THOMAS T. WOODALL, JJ., joined.

Kari I. Weber and Julie K. Pillow, Jackson, Tennessee, for the appellant, Dontae Lamont Brown.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; D. Michael Dunavant, District Attorney General; and Tracey Anne Brewer, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### I.  Factual Background

Barbara Jean Brooks testified that in May 2005, she lived in an apartment on Gay Street in Ripley, Tennessee and was the appellant's next door neighbor.  On May 25, Brooks looked out of her apartment and saw the appellant running back to his apartment.  She did not see anything in his

hands. Later, Brooks saw some people in the apartment complex parking lot and saw the appellant standing in the doorway of his apartment. A woman in the parking lot hit the appellant's girlfriend's car with an object several times. Each time, the appellant asked the woman to stop hitting the car and moved closer to her. The appellant then shot the woman. The woman fell to the ground, and Brooks saw the appellant running on the street. She stated that the appellant did not go to the victim after the shooting and that she did not see anyone else with a gun that day.

On cross-examination, Brooks testified that when she first looked out of her apartment, she saw the appellant running to his apartment and saw fifteen to twenty people running behind him. Brooks did not see the appellant arguing with another man. She stated that the appellant was ten to fifteen feet away from the victim at the time of the shooting and that the appellant fired more than one shot. She stated that she could not say with certainty that the appellant was the only person with a gun that day.

Lashona Johnson testified that she had gone to school with the appellant and was at the Gay Street apartment complex on May 25. She saw the appellant shoot the victim, Stacy Campbell, with a handgun. On cross-examination, Johnson testified that she had been told about an earlier fight on another part of Gay Street. However, she was not involved in it. Johnson and some other people went to the apartment complex to find out about that fight, but the fight was already over. Johnson saw the victim standing in front of the appellant's girlfriend's car and saw about fifteen other people in the parking lot. A woman named Stephanie Barbee hit the car with a car jack, went onto the appellant's porch, and exchanged words with the appellant. A group of people, including a man named Tony Barbee, was standing on the sidewalk and was telling the appellant to come off the porch. However, the appellant refused and was still standing on his porch when he shot the victim. The victim fell down, and Johnson telephoned the police. Johnson did not see the appellant run from the scene but was told he ran though his apartment and out the back door.

The victim testified that the appellant and her aunt, Stephanie Barbee, had a son together. On May 25, the victim was with Stephanie Barbee and the victim's cousins, Tony Barbee and Teneka Barbee. Before the shooting, Teneka and Tony had been fighting on Gay Street with a man named Sammy.[1] During that fight, the appellant was present, hit Tony in the face with a pistol, and drove away. After the fight, the victim, Tony, and Teneka went to Teneka's apartment for a barbecue. Teneka lived next door to the appellant's girlfriend, Trina Pearson. When they arrived at Teneka's apartment, the appellant was standing in the doorway to Pearson's apartment and was holding a pistol. The victim acknowledged that the group "got into it" with the appellant again, and she said Tony pushed the appellant in the face. The victim tried to stop the appellant and Tony from arguing, but the appellant shot the victim. The victim fell onto the ground and asked the appellant for help. However, he stood over her, told her that he could not help her, and ran into Pearson's

---

[1] Given that some of the witnesses in this case have the same last name, we will use their first names. We mean no disrespect to these individuals.

apartment. The victim was taken to a Lauderdale County hospital and flown by helicopter to Jackson Trauma Center. The victim's right ovary was removed, her intestines were "patched," and she received six units of blood. The victim said that the doctors left the bullet in her pelvis and that she could not find a job because the bullet hurt her hip when she stood up. She stated that she continues to have pain and that she cannot have any more children. The victim said that the appellant had enough time to think about who he was shooting and that he ran out the back door of Pearson's apartment after the shooting.

On cross-examination, the victim testified that before the shooting, the appellant moved away from the apartment door and stood in the grass. The victim knew the appellant had just been released from prison and told him not to mess up his life. The victim was not arguing with the appellant but was standing in the parking lot near Pearson's car with Tony, Stephanie, and Teneka at the time of the shooting. The victim did not hit Pearson's car and did not see anyone else hit it. The victim said she had never had any previous problems with the appellant, and she denied having a prior conviction for misdemeanor theft.

Renata Gause, the appellant's cousin, testified for the appellant that she lived on Gay Street in May 2005. On May 25, Teneka Barbee fought with a girl named Andrea Smith. Someone named Sammy fired a gun during the fight, but no one was injured. The appellant was present but left the scene, and Gause did not see the appellant fight with Tony Barbee. On cross-examination, Gause testified that she was only present during the first fight and was not present during the second altercation when the victim was shot.

Anetta Shanks testified that she lived on Gay Street and that a fight occurred on May 25, 2005. Before the fight, Shanks, the appellant, and some other people were sitting in the yard and were waiting for a basketball game to start on television. Shanks heard someone say, "Let them whores fight," and a fight broke out between Teneka Barbee and Andrea Smith. The appellant had already left when the fight started. The victim and Tony Barbee were present during the fight. Shanks said that the victim was holding a bed rail and that "Little Tony," also known as "Fitty," was holding a tire jack. Shots were fired, and everyone scattered. About five minutes later, a second fight erupted on another section of Gay Street, and Shanks heard more gunshots. However, she was not present at the scene of the second fight and did not see the victim get shot. Shanks walked over to the scene of the shooting and saw the victim lying on the ground and asking for help. Shanks did not see the appellant.

Lakisha Smith testified that she lived on Gay Street. On May 25, 2005, Smith's sister, Andrea, got into a fight with Teneka Barbee. Later, Teneka, her cousin, and her brother drove to 265A Gay Street, which was Andrea's apartment. The group, which included the victim, jumped out of the car. They were carrying sticks and rails and ran toward Andrea, and Andrea fought with Teneka. The appellant had been present before the fight but left before the fight started. Shots were fired during the fight, but Lakisha did not see who fired them. After the fight, the group got back into the car and left. Lakisha said that a second fight later occurred on the "B side" of Gay Street

and that she heard gunshots. However, she was not present during that fight and did not know what happened to the victim.

Tony Barbee testified that on May 25, his sister, Teneka Barbee, had been fighting with another girl on Gay Street. Tony, Stephanie Barbee, and the victim went to the scene of the fight, and Tony "got into a little scuffle" with Sammy and Cedric Smith. Tony did not see the victim fight anyone. The appellant was present during the scuffle, but Tony did not fight with him. Although someone hit Tony in the head with a pistol, Tony did not see the appellant hit him. Sammy Smith fired a gun during the fight, but no one was injured. After the fight, Tony went to Teneka's apartment, which was two doors down from Trina Pearson's apartment. The appellant was standing on Pearson's porch, and Tony never walked up to the appellant. Stephanie, Teneka, and the victim were standing in the parking lot, and Tony did not see anything in their hands and did not see anyone hit Pearson's car. Tony saw the appellant point a gun at the victim and fire five or six shots. The victim fell to the ground, and Tony did not see the appellant walk over to her. Tony acknowledged that he had prior convictions for felony failure to appear, two counts of delivering less than one-half gram of cocaine, and possession of contraband in a penal institution. He later testified that he saw the appellant point a handgun at the victim but that he ducked away before the shooting and did not see the appellant shoot the victim. On cross-examination, Tony testified that he never had a weapon on May 25.

Billy Dan Huggins, an investigator with the public defender's office, testified that he and the appellant's attorney interviewed Tony Barbee on May 18, 2006. During the interview, Tony stated that he was only a witness to the first fight on Gay Street and was not involved in the fight. Tony also said the appellant was not involved in the first fight. Regarding the second fight in front of Pearson's apartment, Tony said that he was in someone's apartment when the victim was shot. Huggins did not remember if Tony claimed to have witnessed the shooting, and Tony did not tell Huggins anything about fighting with the appellant on May 25. On cross-examination, Huggins acknowledged that trial witnesses were not always forthcoming during interviews.

Burdeen Haley testified that on May 25, she heard that her grandchildren were fighting on Gay Street. Haley and her daughters drove to an area of the apartment complex on Gay Street and parked in the parking lot. Haley heard "someone hitting like some tin like they was chunking or hitting something." Haley also heard a woman say, "Come out . . . you M-F. You was bad around the other corner. Why don't you come out now?" Haley said she thought the victim made that statement but could not be sure. Haley heard three gunshots, and everyone started running. The victim fell down and said she had been shot. Haley saw a man sitting in the backseat of a car and saw that he had a small gun. Haley's daughter told her that the man's name was "Fitty." Fitty said, "Damn" and did not move or leave. On cross-examination, Haley stated that she did not see who shot the victim.

The appellant testified that on May 25, 2005, he lived at 264B Gay Street with his girlfriend, Trina Pearson. The appellant went "around the corner" of the apartment complex to watch a basketball game and was sitting outside with some friends when the victim, Tony, Stephanie, and

Teneka Barbee arrived. The appellant saw that Teneka had a pipe or stick in her hand and saw Teneka run up to Andrea Smith. Teneka started hitting Andrea on the top of her head, and Tony began fighting with some men. The victim was also present and was holding a long rail. The appellant did not fight anyone, drove back to his apartment, and parked Pearson's car in the parking lot. As he walked toward his apartment, Teneka, Stephanie, and the victim ran toward him. The victim was carrying a car jack, Teneka had a small pipe, and Stephanie had a jack handle. Stephanie asked the appellant why he had hit Tony with a pistol, and the victim ran to Pearson's car and hit the car twice with the jack. The appellant saw Tony sitting in the victim's car and saw Tony bend down. Pearson pulled the appellant into their apartment, the appellant heard gunshots, and he closed the door. When he opened the door, he saw the victim lying next to Pearson's car. The victim asked the appellant for help, but he did not help her because he thought someone was shooting at him. The appellant fled the scene because he had a parole violation and did not want to be present when the police arrived. He stated that he did not have a gun that day, had no reason to shoot the victim, and did not shoot the victim. He stated that he had never argued with the victim previously and that he did not know who shot her.

On cross-examination, the appellant testified that he did not recall Pearson's telling him on May 25, "Don't get into trouble. Don't do this." The appellant said that after the shooting, he ran out the back door and hid in a wooded area. He stated that he fractured his knee and stayed in the woods for about three hours until his brother came and "toted" him out. He was not arrested until August 31 and said he did not learn he had been charged with attempted first degree murder until an investigator told him the next day. He said he was shocked to learn about the charges. When asked why he did not turn himself in to police, he said that he did not go to the police because he had a parole violation. He stated that in a crime scene photograph introduced into evidence, the car jack that the victim was holding could be seen laying in the parking lot next to Pearson's car.

Trina Pearson testified on rebuttal for the State that the appellant was not living with her at 264B Gay Street at the time of the shooting but was visiting her apartment. Pearson heard her car pull up outside, and the appellant got out. The appellant walked toward Pearson's apartment, and another car pulled up behind him. Three females got out of the car and came at the appellant with sticks, bats, and jacks. They claimed the appellant had hit their cousin. Pearson telephoned 911, heard gunshots, and ducked down. When she looked out the window, she saw the victim lying in the parking lot. She stated that a lot of people had been in the parking lot before the shooting and that she did not know if any of them had guns. She said she saw the appellant with a gun that day but did not see him fire it.

On cross-examination, Pearson testified that a lot of people outside her apartment had guns and that she telephoned 911 because the three females were going to attack the appellant. On redirect examination, Pearson acknowledged that in her statement to police, she said the appellant fired the gun. However, she noted that she did not tell the police the appellant shot at anyone. The jury convicted the appellant of attempted first degree murder and aggravated assault against the victim.

## II. Analysis

### A. Sufficiency of the Evidence

The appellant contends that the evidence is insufficient to support the convictions. Specifically, he argues that the witnesses' testimony was "so divergent that the State did not present a clear case of the facts of that day to arise to evidence of attempted first degree murder or aggravated assault" and that the only fact that can be established is that someone shot the victim. Regarding the attempted first degree murder, the appellant also contends that the evidence is insufficient to show that he intended to kill the victim or premeditated any killing because there was no evidence of a prior troubled relationship between the appellant and the victim, no evidence of a plan or motive, no evidence that the appellant made any statement of intent to kill, and the appellant did not act calmly after the shooting. The State contends that the evidence is sufficient. We agree with the State.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. Id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

First degree murder is the premeditated and intentional killing of another person. Tenn. Code Ann. § 39-13-202(a)(1).[2] A premeditated killing is one "done after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202(d). Criminal attempt requires that a person act "with the kind of culpability otherwise required for the offense . . . [and] with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part." Tenn. Code Ann. § 39-12-101(a)(2). The element of premeditation is a question of fact for the jury. State v. Davidson, 121 S.W.3d 600, 614 (Tenn. 2003). Although the jury may not engage in speculation, it may infer premeditation from the manner and circumstances surrounding the killing. State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997). Our supreme court has

---

[2]We note that in his brief, the appellant contends that all homicides are presumed to be second degree murder. However, in State v. Jackson, 173 S.W.3d 401, 403 (Tenn. 2005), our supreme court held that "the second degree murder presumption is now obsolete."

delineated several circumstances from which a jury may infer premeditation, including, but not limited to, declarations of the intent to kill, evidence of the procurement of a weapon, the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, preparations before the killing for the purpose of concealing the crime, and calmness immediately after the killing. Id. As charged in the indictment, aggravated assault occurs when a person uses a deadly weapon to intentionally or knowingly cause bodily injury to another person. Tenn. Code Ann. § 39-13-102(a)(1)(B), -101(a)(1).

We agree with the appellant that many of the witnesses gave conflicting testimony, and we note that many were elusive in their answers to the State's and the defense's questions. However, the evidence still establishes that the appellant was present during a fight that occurred near Andrea Smith's apartment on May 25, 2005. During that fight, Andrea Smith fought with Teneka Barbee, and Tony Barbee fought with some men. Tony Barbee was struck in the head with a pistol, and the victim, Stephanie Barbee, Tony Barbee, and Teneka Barbee believed the appellant was responsible. The appellant left the scene of the first fight and returned to Trina Pearson's apartment, and the group followed him there. They confronted the appellant, who was holding a pistol, and demanded that he come off Pearson's porch. The victim then struck Pearson's car with the car jack. The appellant told the victim to stop several times, but she refused. Several eyewitnesses testified that they saw the appellant point the pistol at the victim and fire several shots, striking her once in the abdomen. Despite the appellant's claim to the contrary, his confrontation with the victim and her hitting Pearson's car were motives for the shooting. Moreover, the appellant possessed a handgun, pointed the gun specifically at the victim, and fired several shots at her. Taken in the light most favorable to the State, this evidence is sufficient to show that the appellant shot the victim and that he acted intentionally and with premeditation. Thus, the evidence is sufficient to support the convictions.

## B. Flight Instruction

The appellant contends that the trial court erred by giving the jury an instruction on flight because the appellant fled from the scene due to his parole violation, not because he was trying to evade arrest for shooting the victim. The State argues that the appellant's fleeing the scene and hiding out supported the instruction. We conclude that the trial court did not err by giving the instruction.

Following the conclusion of the proof, the trial court announced that it would be instructing the jury on flight. The appellant objected, arguing that the proof did not show the appellant fled for the purpose of evading arrest on the charges in this case. The trial court overruled the objection and used Tennessee Pattern Jury Instruction 42.18, the instruction on flight, specifically charging the jury as follows:

> The flight of a person accused of a crime [is] a circumstance which, when considered together with all the facts of the case, may justify an inference of guilt. Flight is the voluntary withdrawal of

oneself for the purpose of evading arrest or prosecution for the crime charged. Whether the evidence presented proves beyond a reasonable doubt that the defendant fled is a question for your determination. . . . If flight is proved, the fact of flight alone does not allow you to find that the defendant is guilty of a crime alleged. However, since flight by a defendant may be caused by a consciousness of guilt, you may consider the fact of flight, if flight is so proven, together with all of the other evidence when you decide the guilt or innocence of the defendant. On the other hand, an entirely innocent person may take flight, and such flight may be explained by proof offered or by the facts and circumstances of the case. Whether there was flight by the defendant, the reasons for it, and the weight to be given to it are all questions for you to determine.

In order to instruct the jury on flight, sufficient evidence must exist to support the instruction. State v. Berry, 141 S.W.3d 549, 588 (Tenn. 2004). Sufficient evidence requires "a leaving the scene of the difficulty and a subsequent hiding out, evasion, or concealment in the community." State v. Payton, 782 S.W.2d 490, 498 (Tenn. Crim. App. 1989). "A flight instruction is not prohibited when there are multiple motives for flight," and "[a] defendant's specific intent for fleeing a scene is a jury question." Berry, 141 S.W.3d at 589; see State v. Smith, 893 S.W.2d 908, 918 (Tenn. 1994) (concluding that the meaning and weight of such evidence is a jury question). Moreover, this court has stated that

the flight instruction pointed out to the jury that innocent persons may take flight, and it was up to the jury to determine whether there was flight, the reasons for the flight, and the weight to be given to it. Just as the instruction allowed an inference of guilt from flight, it also instructed that the evidence, facts, and circumstances may show that an innocent person may take flight.

State v. Richardson, 995 S.W.2d 119, 129 (Tenn. Crim. App. 1998).

In the instant case, the appellant admitted that he ran through the apartment and out the back door immediately after the shooting and hid in the woods for several hours. He remained at large for three months. We conclude that this evidence established both a "leaving the scene" and a "hiding out" and warranted an instruction on flight. The appellant's reason for fleeing the scene was resolved by the jury. The trial court did not err by providing the instruction.

### C. Excessive Sentence

The appellant contends that the trial court erred by not considering his age as a mitigating factor and that his midrange sentence is excessive in light of the circumstances of the case. The State argues that the trial court properly sentenced the appellant. We agree with the State.

-8-

At the appellant's sentencing hearing, the victim acknowledged that she still experienced physical pain as a result of the shooting and that she was going to have to decide whether to have surgery on her hip. She stated that she was often depressed and that the trial court should give the appellant the "best" sentence possible.

Darrell Smothers from the Tennessee Board of Probation and Parole testified that he prepared the appellant's presentence report. The appellant failed to give his version of the May 25 events for the report and declined to submit a written statement for the report. Smothers stated that the appellant has prior convictions for two counts of felony cocaine delivery, two counts of driving without a license, driving on a suspended license, misdemeanor assault, and disorderly conduct. The appellant also has had his probation revoked twice previously, and he was on parole when he committed the offenses in question.

The appellant testified that he was currently in prison and taking classes to obtain his GED. He also was planning to take anger management and drug abuse classes, which he believed would aid in his rehabilitation. He stated that he had five children and was supporting those children before he was incarcerated. However, he had been unable to support them while in prison. He said that when he was released from confinement, he planned to get his family back, gain employment, better himself, and take care of his children. On cross-examination, he stated that the did not shoot the victim.

Trina Pearson testified that she and the appellant had several children together. Prior to the appellant's incarceration, he supported his children. Pearson stated that she believed the appellant was trying to rehabilitate himself while in prison. She said that prior to the shooting, the appellant tried to stay out of trouble but that trouble "ran his way."

According to the appellant's presentence report, the then twenty-five-year-old appellant was single and dropped out of high school during the twelfth grade. The appellant reported that his physical and emotional health were good but that a problem with his right knee prevented him from standing for long periods of time on his right leg. He described his mental health as excellent but said he was mentally disabled. According to the report, the appellant stated during an interview that he had used marijuana twice previously, but he stated on his presentence report questionnaire that he had never used illegal drugs. The report shows the appellant tested negative for drugs in September 2004 and January 2005 but field-tested positive for marijuana in June 2006. The appellant reported that he did not drink alcohol and that he received some counseling at the William F. Walker Counseling Center about five years previously. The reports shows that the appellant has worked as a janitor for Slimfast/Diversco, a press operator for Edwards Gin Company, a car detailer for Custom Wheels and Dealers, a cook for McDonald's, and a third-shift remodeler for Wal-Mart.

According to the report, the appellant has prior convictions for evading arrest, failure to appear, driving with a suspended license, and misdemeanor assault. The report also shows that the appellant has two prior felony drug convictions, that he has violated probation previously, and that he was on parole when he committed the offenses in this case. As a juvenile, the appellant was

adjudicated delinquent of truancy, theft, unruly behavior, violation of probation, and violation of the city curfew law.

The trial court stated that it had considered the presentence report, the principles of sentencing, the testimony at trial and the sentencing hearing, and an impact statement submitted by the victim. The court found the appellant to be a Range II, multiple offender and applied enhancement factor (1), that the appellant "has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range," and factor (13), that the appellant had been released on parole when he committed the felonies in question. See Tenn. Code Ann. § 40-35-114(1), (13) (2006). The trial court applied no mitigating factors. It noted that for the Class A felony attempted murder conviction, the presumptive sentence was the midpoint in the range, which was twenty-five to forty years, and sentenced the appellant to thirty-two years in confinement. See Tenn. Code Ann. § 40-35-112(b)(1). For the Class C aggravated assault conviction, the trial court enhanced the appellant's minimum presumptive sentence from six to eight years. See Tenn. Code Ann. § 40-35-112(b)(3). The trial court merged the aggravated assault conviction into the attempted murder conviction and ordered that he serve his thirty-two-year sentence consecutively to a previous sentence.

Appellate review of the length, range or manner of service of a sentence is de novo. See Tenn. Code Ann. § 40-35-401(d). In conducting its de novo review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statement by the appellant in his own behalf; and (7) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210; see also State v. Ashby, 823 S.W.2d 166, 168 (Tenn. 1991). The burden is on the appellant to demonstrate the impropriety of his sentence. See Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments. Moreover, if the record reveals that the trial court adequately considered sentencing principles and all relevant facts and circumstances, this court will accord the trial court's determinations a presumption of correctness. Id. at (d); Ashby, 823 S.W.2d at 169.

The appellant first contends, without any explanation, that the trial court should have mitigated his sentence because he was only twenty-four years old when he committed the offenses. See Tenn. Code Ann. § 40-35-113(6) (2006) (providing as a mitigating factor that the defendant "because of youth or old age, lacked the substantial judgment in committing the offense"). However, the defense presented no evidence that the appellant lacked substantial judgment because of his "age, education, maturity, experience, mental capacity or development, and any other pertinent circumstance tending to demonstrate the defendant's ability or inability to appreciate the nature of his conduct." State v. Carter, 908 S.W.2d 410, 413 (Tenn. Crim. App. 1995) (quoting State v. Adams, 864 S.W.2d 31, 33 (Tenn. 1993)). Therefore, the trial court did not err by failing to apply this factor.

The appellant also contends that his automatically receiving the midpoint punishment in the range, thirty-two years, for the attempted murder conviction was unduly harsh. In support of his argument, he notes that effective June 7, 2005, only days after he committed these offenses, our legislature amended several provisions of the Criminal Sentencing Reform Act of 1989. One of those amendments eliminated presumptive sentences and instructed trial courts to sentence defendants to the minimum in the range and then adjust the sentence based upon mitigating and enhancing factors. Compare Tenn. Code Ann. § 40-35-210(c) (2003) with Tenn. Code Ann. § 40-35-210(c) (2006). However, because the appellant committed the crimes in this case before June 7, 2005, and did not "elect to be sentenced under the provisions of the act by executing a waiver of his ex post facto protections," the trial court did not err by not sentencing him under the old provisions. Tenn. Code Ann. § 40-35-114 (2006), Compiler's Notes. The trial court properly sentenced the appellant to the midpoint in the range for the attempted murder conviction, and he is not entitled to relief.

We note that given that the trial court merged the aggravated assault conviction into the attempted murder conviction, the court should have entered only one judgment of conviction for that offense. See State v. Howard, 30 S.W.3d 271, 275 (Tenn. 2000). Therefore, we remand the case for the trial court to enter a single judgment reflecting the merger of the convictions.

### III. Conclusion

Based upon the record and the parties' briefs, we affirm the jury's guilty verdicts and the appellant's thirty-two-year sentence. However, the case is remanded to the trial court for further proceedings consistent with this opinion.

_____
NORMA McGEE OGLE, JUDGE