# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON

Assigned on Briefs November 2, 2010

## STATE OF TENNESSEE v. PRINCE ADAMS

### Direct Appeal from the Criminal Court for Shelby County
No. 06-06987    James M. Lammey, Jr., Judge

_____

### No. W2009-01492-CCA-R3-CD - Filed September 21, 2011

_____

The defendant, Prince Adams, was convicted by a Shelby County jury of premeditated first degree murder and subsequently sentenced to life in the Tennessee Department of Correction. He now appeals his conviction, presenting five issues for our review: (1) whether the evidence is sufficient to support the conviction; (2) whether the trial court properly allowed into evidence photographs of the victim (a) while she was alive and (b) of her body at the crime scene; (3) whether the court properly denied the defendant's motion in limine with regard to the admission of his prior domestic violence charge; (4) whether the defendant is entitled to a new trial because an alternate juror left a note expressing his position with regard to the defendant's guilt, which was found by the jury foreperson prior to jury deliberations; and (5) whether the court correctly denied the defendant's request for a special jury instruction on diminished capacity. Following review of the record, we find no issue that would entitle the defendant to relief. As such, the conviction and sentence are affirmed.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J., and JERRY L. SMITH, J., joined.

Brett Stein and Larry Diamond, Memphis, Tennessee, for the appellant, Prince Adams.

Robert E. Cooper, Jr., Attorney General and Reporter; Cameron L. Hyder, Assistant Attorney General; William L. Gibbons, District Attorney General; and Patience Branham and David Zak, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### Procedural History

The defendant's conviction in this case arose from the killing of his girlfriend, Ohdra Flowers. The victim was last seen alive by family and friends late on April 16, or in the very early morning hours of April 17, 2006. Later in the day on April 17, 2006, a police officer was called to the scene of a minor car accident involving the defendant driving a car, later identified as the victim's. The defendant appeared incoherent and unstable on his feet. In response to the officer's questions regarding alcohol, the defendant responded that he had taken Ambien, a sleep aid medication. Because of the defendant's condition, the officer did not feel that it was safe to conduct field sobriety tests. Instead, he issued the defendant a misdemeanor citation and called an ambulance to take the defendant to the hospital. In checking the car the defendant had been driving, the officer noticed blood on the seat. When asked, the defendant told the officer that he had been in a fight with his girlfriend's boyfriend and had "cut him." No further investigation was done on the blood at that time, and the car was impounded.

On April 18, the defendant telephoned his cousin, Andre Smith, and asked him to visit him at a motel. The defendant explained that he and the victim had been fighting about their relationship and that he had some audio tapes he wanted Mr. Smith to pick up. Mr. Smith was unable to go to the motel but told the defendant to leave the tapes at his house. However, after he finished work that day, Mr. Smith returned to his car and found a bag containing the audio tapes. After listening to the tape that had his name on it, Mr. Smith began trying to locate the defendant. He eventually received another call from the defendant, asking him to come to a motel and pick him up. He did so. When Mr. Smith arrived, he found the defendant in the presence of police officers, who explained that they had finished questioning the defendant and that he was presently free to go. It was later ascertained that the defendant had paid for his motel stay in cash, which he had taken from the victim's bank account using her ATM card.

Mr. Smith attempted to take the defendant to his father's house, but no one was at the home at the time. The defendant, who had begun to cry, got out of the car and began to walk down the street in a hurried manner. Mr. Smith went after the defendant and attempted to bring him back to the car. The defendant kept repeating that he wanted to go see the victim and was generally acting confused.

Eventually, the defendant related to Mr. Smith that he had recently become concerned that the victim was cheating on him. On Sunday, April 16, he contacted the victim, and she took him to his mother's residence. He told Mr. Smith that he remained at his mother's house for several hours and took two Ambien pills during this time. Later in the evening, the victim came to take him home. The defendant told Mr. Smith that, during the ride, a confrontation occurred when the victim admitted, rather bluntly, that she was cheating on him. The defendant also claimed that the victim stated that she was not going to help him with an apartment that he was supposed to move into a few days

later. The defendant claimed that he became upset, grabbed a pocket knife, and used it to kill the victim.

During this recitation to Mr. Smith, the defendant became hysterical and said that he wanted to see the victim. Mr. Smith was finally able to ascertain that the victim was located in the park and promised to take the defendant there to see the victim's body if the defendant would turn himself in to the police afterward. The defendant agreed. They then drove to the park and, after a few moments of searching, found the victim's body. Despite Mr. Smith's pleas to the contrary, the defendant went to the victim's body, saying that he wanted to straighten her disheveled clothes before she was seen. The defendant also removed the knife from the victim's body. The defendant eventually removed his own shirt, placed a photo of the victim over his chest, and appeared as if he was going to stab himself.

When the defendant failed to heed Mr. Smith's pleas to stop and turn himself in, Mr. Smith called 9-1-1. When the authorities arrived on the scene, they found the defendant crying as he stood over the victim's body. He informed the authorities that he wanted to kill himself just like he had killed her. The defendant again made motions like he was stabbing himself and did, in fact, inflict some superficial wounds. He was taken into custody by police and transported to the police station.

The defendant was interviewed by detectives and gave a statement to them. He said that he and the victim had been driving around when she disclosed that she was having an affair. According to the statement, the defendant became angry and kicked her out of the vehicle. He initially stated that he blacked out and could not remember what occurred afterward. However, during a second interview with the authorities, the defendant stated that he had stabbed the victim after she acknowledged her affair. Nonetheless, he maintained that, afterward, he blocked the entire incident from his mind. Forensic testing later confirmed that the victim's blood was in the car and on the knife. An autopsy determined that the cause of death was the victim's stab wounds, numbering more than thirty, several of which would have been singularly fatal.

Based on this information, the defendant was indicted by a Shelby County grand jury for first degree premeditated murder. A jury trial was subsequently held. At trial, the defendant proceeded under the theory that he could not have formed premeditation based upon his reaction to Ambien. In support of that defense, he called three doctors to testify at trial. Dr. Lipman testified with regard to the general effects that Ambien had been known to have on people. Dr. Curso testified that the defendant was an abuser of Ambien and was particularly vulnerable to its effects. Dr. Angelillo testified that he had treated the defendant and, while he did not consider him to be psychotic, he did consider him to be "seriously disturbed." However, the jury rejected the defense and found the

defendant guilty as charged. He was subsequently sentenced to life imprisonment. Following the denial of his motion for new trial, the defendant filed the instant timely appeal.

## Analysis

On appeal, the defendant has raised multiple issues for our review: (1) whether the evidence presented was sufficient to support the conviction; (2) whether the court properly admitted photographs at trial of the victim (a) while she was alive and (b) at the crime scene; (3) whether the court properly denied the motion in limine with regard to the admission of a tape containing the defendant's statement about a prior domestic violence charge; (4) whether the defendant is entitled to a new trial on the basis that a juror received a written communication from a dismissed alternate juror indicating that the alternates thought the defendant was guilty; and (5) whether the trial court properly denied the request for a special jury instruction on diminished capacity. The State asserts that no issue presented entitles the defendant to relief. Following review, we agree.

## I. Sufficiency of the Evidence

First, the defendant contends that the evidence presented at trial was not sufficient to support his conviction for first degree premeditated murder. He challenges only the element of premeditation, acknowledging that the "only issue before the jury was whether or not the defendant killed the victim unlawfully, intentionally and with the requisite premeditation necessary to constitute first degree murder." The defendant contends that, based upon the facts and circumstances presented, the record establishes that he "was incapable of forming the necessary intent of premeditation." He contends he should have been found guilty of the lesser offenses of second degree murder or voluntary manslaughter because the State failed to establish that he "was sufficiently free from excitement and passion as to be capable of premeditation" at the time of the murder.

When an accused challenges the sufficiency of the convicting evidence, the standard of review is "whether, after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319 (1979) (emphasis in original); *State v. Goodwin,* 143 S.W.3d 771, 775 (Tenn. 2004); *see also* Tenn. R. App. P. 13(e). "[T]he State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom." *State v. Smith,* 24 S.W.3d 274, 279 (Tenn. 2000). Questions involving the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and an appellate court does not reweigh or re-evaluate the evidence. *State v. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003).

A jury verdict approved by the trial court accredits the State's witnesses and resolves all conflicts in the evidence in favor of the State. *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). "Because a verdict of guilt removes the presumption of innocence and imposes a presumption of guilt, the burden shifts to the defendant upon conviction to show why the evidence is insufficient to support the verdict." *State v. Thacker*, 164 S.W.3d 208, 221 (Tenn. 2005). These rules are applicable to findings of guilt predicated upon the direct evidence, circumstantial evidence, or a combination of both. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

Tennessee Code Annotated section 39-13-202(a)(1) provides that "[f]irst degree murder is . . . [a] premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1) (2006). An intentional killing requires that the person have the conscious objective or desire to cause the death of the victim. *State v. Quincy DeAngelo Gardner*, No. M2007-01081-CCA-R3-CD (Tenn. Crim. App. at Nashville, Jun. 10, 2008).

"'[P]remeditation' is an act done after the exercise of reflection and judgment." T.C.A. § 39-13-202(d). The element of premeditation is a question of fact to be resolved by the jury and may be established by proof of the circumstances surrounding the killing. *State v. Suttles*, 30 S.W.3d 252, 261 (Tenn. 2000). Proof of premeditation is inherently circumstantial. The trier of fact cannot speculate what was in the killer's mind, so the existence of premeditation must be determined from the defendant's conduct in light of the circumstances surrounding the crime. *State v. Johnny Wright*, No. 01C01-9503-CC-00093 (Tenn. Crim. App. at Nashville, Jan. 5, 1996). Thus, in evaluating the sufficiency of proof of premeditation, the appellate court looks to the circumstances surrounding the killing. *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997). Such circumstances may include "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime, and calmness immediately after the killing." *State v. Leach*, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000) (citing *Bland*, 958 S.W.2d at 660). However, while relevant to review, the list of enumerated factors is not exhaustive. *State v. Davidson*, 121 S.W.3d 600, 615 (Tenn. 2003). Further, there is no required amount of time that must elapse between the formation of the intention to kill and the actual killing so as to establish premeditation. *Cagle v. State*, 507 S.W.2d 121, 129 (Tenn. Crim. App. 1971). Additionally, a defendant's failure to render aid to the victim is an additional circumstance probative of premeditation. *State v. Lewis*, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000).

As noted, the only element challenged by the defendant is that of premeditation. There is no dispute that the defendant did, in fact, kill the victim, as he admitted to that fact and proceeded under that theory at trial. With regard to the defendant's challenge to

premeditation, although no clear argument is made, we assume that his contention that the "State failed to prove he was sufficiently free from excitement and passion" is based upon his ingestion of and reaction to Ambien. However, these contentions, along with the testimony of three doctors to support them, were put before the jury at trial. The defendant's theory was obviously rejected in light of their verdict. We will not review the weight of the evidence assigned by the jury.

Our review reveals sufficient evidence to establish the element of premeditation. Several of the enumerated factors which support a finding of premeditation are found in this case. Here, the defendant viciously attacked the unarmed victim while in the car. Although not entirely clear how the events unfolded, he stabbed her more than thirty times before he disposed of her body in a park. This supports a finding of a particularly cruel killing. Moreover, this court has held that stabbing wounds are more consistent with premeditation than other types of wounds because the act of stabbing, by its very nature, requires more effort, time, and intimate contact than does simply pulling the trigger of a gun. *See State v. Jason Christopher Underwood*, No. M2006-01826-CCA-R3-CD (Tenn. Crim. App. at Nashville, Dec. 10, 2008); *see also State v. Keough*, 18 S.W.3d 175, 181 (Tenn. 2000) (finding sufficient evidence of premeditation from the brutal nature of the stabbing). The defendant is not entitled to relief on this issue.

## II. Admission of Photographs

Next, the defendant contends that the trial court erred in allowing into evidence a photograph of the victim while she was alive and photographs of the body found at the crime scene. The admissibility of photographs is governed by Tennessee Rules of Evidence 401 and 403. *State v. Banks*, 564 S.W.2d 947 (Tenn. 1978). The evidence must be relevant, and its probative value must outweigh any prejudicial effect. Tenn. R. Evid. 403. The decision to admit the photographs rests within the sound discretion of the trial court and will not be reversed absent a clear showing of an abuse of that discretion. *State v. Dickerson*, 885 S.W.2d 90, 92 (Tenn. Crim. App. 1993). To be admissible, a photograph must be relevant to some issue at trial, and the danger of unfair prejudice, confusion of the issues, or misleading the jury must not substantially outweigh its probative value. Tenn. R. Evid. 403. The term "unfair prejudice" has been defined as "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Banks*, 564 S.W.2d at 951.

In deciding whether to admit photographs, the trial court must consider the question of fact that the jury will have to consider in determining the accused's guilt, as well as other evidence that has been introduced during the course of the trial. *State v. Williamson*, 919 S.W.2d 69, 78 (Tenn. Crim. App. 1995). Photographs are not necessarily rendered inadmissible because they are cumulative of other evidence or

because descriptive words could be used. *Collins v. State*, 506 S.W.2d 179, 185 (Tenn. Crim. App. 1973). However, photographs must be relevant to prove some part of the prosecution's case and must not be admitted solely to inflame the jury and prejudice them against the defendant. *Banks*, 564 S.W.2d at 951.

### A. Photograph of the Victim While Alive

First, the defendant challenges the trial court's decision to admit a photograph of the victim taken prior to the crime, asserting that it was error because the photograph may have caused the jury to convict the defendant based on emotion rather than fact. According to the defendant, the admission of this photograph caused "this picture [to become] stuck in the minds of the jury which could have had the effect of influencing their decision of how they viewed the proof."

Our courts have repeatedly cautioned trial judges to give careful consideration to the issue of relevancy before admitting photographs of a victim taken prior to the crime. Such photos are often of tenuous relevancy. *See State v. Dicks*, 615 S.W.2d 126, 128 (Tenn. 1981) ("[I]t would have been better had the 'before' picture of [the victim] been excluded since it added little or nothing to the sum total of knowledge of the jury."); *State v. Young*, 196 S.W.3d 85, 106 (Tenn. 2006) (holding that the relevancy of pictures taken of the murder victim in her childhood was "only slight"). Likewise, when trial judges are conducting a Rule 403 analysis, they should carefully consider whether such pictures will unduly arouse the passions of a jury. *See Young*, 196 S.W.3d at 106 (emphasizing that photographs of an adult murder victim taken in her childhood "ha[ve] the distinct probability of appealing to the emotions of the jury"). It is well-established that pictures of a murder victim depicting the victim's life prior to the crime should be excluded where their "primary purpose . . . is to elicit emotions of bias, sympathy, hatred, contempt, retribution, or horror." *Id.* (internal quotations omitted).

Here, the trial court admitted a photograph of the victim depicting her while still living a customary life on the grounds that it was relevant to show the existence of a life-in-being. It is clear that the photographs taken of the victim at the crime scene amply sufficed to prove her existence. The issue of the victim's life or existence was not a matter of dispute at trial. Consequently, the trial judge's reliance on the purported need to establish the existence of the murder victim's life to support his conclusion that the photograph at issue was relevant was misplaced, and the decision to admit the photograph constituted error.

Indeed, the State in its brief does not mount a serious effort to defend the trial judge's determination that the photograph of the victim taken while alive was relevant to any significant issue of dispute at the trial. Rather, the State asserts that this court should

find any error that may have occurred harmless in light of the overwhelming evidence against the defendant. *See, e.g., Young*, 196 S.W.3d at 106-07 (upholding conviction despite error in admitting photographs of victim while alive because "the trial court's error . . . was harmless"); *Dicks,* 615 S.W.2d at 128 (finding no prejudicial error in the admission of such photographs); *State v. Richardson,* 697 S.W.2d 594, 596-97 (Tenn. Crim. App. 1985) ("As to the photographs of [the victim taken before and after the offense], we find no prejudicial error in their admission."). We agree that the evidence against this defendant is overwhelming, and in light of *Young*, *Dicks*, and *Richardson*, we conclude that the admission of this particular photograph in this particular case constituted harmless error. However, we feel compelled to again caution against the admission of such minimally relevant photographs, which have the potential to undermine and place in jeopardy the outcome of the entire judicial proceedings. Moreover, although the various cases have viewed admission of such a picture as harmless error, "it is inappropriate for the appellate courts to preside over the creation of a body of 'harmless error law.'" *State v. Gorman*, 628 S.W.2d 739, 740 (Tenn. 1982). "At some point, the need to preserve the integrity of the judicial process will require that the continued practice not be subject to the harmless error rule." *State v. Richardson*, 995 S.W.2d 119, 127 (Tenn. Crim. App. 1998).

### B. Admission of Crime Scene Photographs

The defendant also challenges the trial court's decision to admit into evidence photographs of the victim's body taken while at the crime scene. He contends that the photographs were inflammatory and prejudicial in light of the fact that the defendant admitted that he committed the murder. He asserts that "the pictures introduced by the State [were] totally irrelevant, inflammatory and prejudicial because the probative value would not clearly be outweighed by the prejudicial effect." The State disagrees.

Generally, "photographs of the corpse are admissible in murder prosecutions if they are relevant to the issues on trial, notwithstanding their gruesome and horrifying character." *Banks*, 564 S.W.2d at 950-51. Moreover, our supreme court has held that photographs may be introduced in order to illustrate testimony. *State v. Stephenson*, 878 S.W.2d 530, 542 (Tenn. 1994). Additionally, it has previously been held that photographs, even graphic ones, are admissible to show violence or the nature of the injuries sustained. *State v. Pappas*, 754 S.W.2d 620, 624 (Tenn. Crim. App. 1987).

Review of the record again reveals no abuse of discretion in the admission of these photographs. As argued by the State, the trial court found that the photographs were relevant to show the vantage point from which the victim's body was discovered, to show the extent of the injuries, to illustrate the testimony of the medical examiner, to establish the length of time the body remained undiscovered, and to show the defendant's intent

and state of mind. We agree. Moreover, the court carefully considered the prejudicial effect of each photograph prior to allowing its admission. The court found that all but two of the photographs, those that showed no visible wounds, were in no way unfairly prejudicial. With regard to the two more graphic photos, the court concluded that they were "not humanized to the extent that it would be unduly graphic because no facial expression is seen." Again, we cannot conclude that the court abused its discretion in weighing the relevance of the photographs against any prejudice which they caused. As such, the defendant has failed to carry his burden of showing entitlement to relief on this issue.

## III. Motion In Limine Regarding a Prior Domestic Assault Charge

Next, the defendant contends that the trial court erred by denying his motion in limine to exclude a tape recording made by the defendant and given to Mr. Smith in which the defendant related the facts and circumstances surrounding his involvement in the murder. The basis of the motion was that, on the tape, the defendant went into detail regarding a prior domestic violence charge to which he pled guilty and received probation.

The admissibility, relevancy, and competency of evidence are matters entrusted to the sound discretion of the trial court, and this court must review the trial court's evidentiary rulings for an abuse of discretion. *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997). Tennessee Rule of Evidence 401 states that "'[r]elevant evidence' is evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 402 states that "[a]ll relevant evidence is admissible except as provided by the Constitution of the United States, the Constitution of Tennessee, these rules, or other rules of law generally applicable in the courts of Tennessee. Evidence which is not relevant is not admissible." Tenn. R. Evid. 401, 402.

Additionally, Tennessee Rule of Evidence 404(a) states that "[e]vidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity with the character or trait on a particular occasion, except [that the accused may introduce evidence] of a pertinent character trait." Tenn. R. Evid. 404(a)(1). Rule 404(b) states that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait" but that this evidence may be used for other purposes. The rule lists four requirements that must be satisfied before a court determines admissibility:

(1) [t]he court upon request must hold a hearing outside the jury's presence;

(2) [t]he court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) [t]he court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) [t]he court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b).

Again, this court reviews a trial court's ruling on evidentiary matters under Rule 404(b), using an abuse of discretion standard provided that the trial court has substantially complied with the procedural prerequisites of the rule. *DuBose*, 953 S.W.2d at 652. If the court did not substantially comply with the procedure, its decision is not entitled to deference by the appellate court. *Id*. at 653. While evidence of a prior crime, wrong, or act is not admissible to prove that a defendant had the propensity or disposition to commit the crime, it may be relevant and admissible to prove issues such as identity, intent, motive, opportunity, or absence of mistake or accident. *State v. Shropshire*, 45 S.W.3d 64, 75 (Tenn. Crim. App. 2000). Where the trial court has been called to pass upon the admissibility of evidence of other crimes, wrongs, or acts under Rule 404(b), its determination is entitled to deference when it has substantially complied with the procedural requisites of Rule 404(b). *Thacker*, 164 S.W.3d at 240.

Initially, we note that the record reflects that the trial court complied with the procedure required by the rules of evidence, and, thus, its ruling is entitled to deference. During the jury out hearing, the trial court found that a material issue existed other than conduct conforming with a character trait, as the comments made on the tape went directly to the defendant's state of mind. The court, while noting that the quality of the tape made it hard to tell exactly what was described by the defendant, found that there were no statements made on the tape describing events which rose to the level of major violence where someone was killed. The court further found that the evidence was clear and convincing with regard to the defendant's prior act, as it was admitted and described in his own words. The court reiterated that the information was relevant and probative of the defendant's state of mind at the time of the crime as the defendant's whole theory of the case centered on his state of mind. In addition, the court specifically found that the statement on the tape regarding the prior events was not prejudicial, stating that there is so much probative value and so little danger of unfair prejudice because the intent and the state of mind is what this case is about.

-10-

The defendant acknowledges that the trial court complied with the procedure laid out in the rules and appears to challenge only the trial court's ruling that the evidence was more probative than prejudicial. The defendant, while agreeing with the trial court that the evidence was probative with regard to the defendant's state of mind, contends that the record supports a finding that it was "unduly prejudicial" as reflected by the question asked by the jury during deliberations. He stated:

> The point is that this question is proof that the jury was having trouble on the only issue that it was to decide which was the [defendant's] state of mind at the time of the homicide. Therefore, any type of proof, especially a charge of domestic assault, in the context of this case could have been the key factor in which caused the jury to reach a verdict of murder in the first degree rather than a lesser included charge of homicide.

Our review of the record leads us to conclude that the trial court did not abuse its discretion in allowing the tape into evidence. As stated by the trial court, the evidence was highly probative as the defendant's whole theory involved his state of mind at the time of the crime, *i.e.*, that he did not kill the victim with premeditation. Moreover, we cannot conclude that the record establishes a particularly strong risk of prejudicial effect. The length and descriptions given by the defendant were not particularly detailed, and the quality of the tape was poor. Moreover, nothing described on the tape was equivalent to the crime in the instant trial. As such, we simply cannot conclude that the trial court abused its discretion; therefore, the defendant is entitled to no relief.

## IV. Written Communication to Juror

Next, the defendant asserts that he is entitled to a new trial because the jury foreperson received a note that was improper extrinsic contact. The defendant claims that this type of error is presumed to be prejudicial. We agree but conclude that the State made a showing that was sufficient to overcome this presumption. Consequently, the defendant is not entitled to relief.

There generally appears to be no dispute regarding the facts on which the defendant's challenge is based. The evidence reflects that the jury foreperson in this case returned to his motel room after the dismissal of the alternates and found a note that had been left by his former roommate, one of the alternate jurors. The note indicated that his former roommate and the other alternate juror thought that the defendant was guilty of first degree murder. With the exception of this note, none of the jurors had any discussions with regard to the defendant's guilt. The foreperson did not mention the note to the other jurors or to anyone else prior to or during the jury's deliberations. The note's

existence only came to light when the foreperson "just mentioned it in passing" to the trial judge after the case was complete.

At a hearing on his motion for new trial, the defendant called the jury foreperson as a witness, and he testified to the facts generally described above. Over the defendant's objection, the foreperson also testified that the note he found had no impact on his verdict. The trial judge subsequently held that there was no likelihood that the note had "actually affected deliberations" and denied the defendant's claim.

The Sixth Amendment to the United States Constitution and Article I, section IX of the Tennessee Constitution guarantee a criminal defendant the right to a trial "by an impartial jury." When a juror's impartiality is called into question, the defendant initially "bears the burden of providing a *prima facie* case of bias or partiality." *State v. Akins*, 867 S.W.2d 350, 355 (Tenn. Crim. App. 1993). When the defendant's claim of bias relates to some improper extrinsic contact that occurred during the jury's deliberations, the defendant must first adduce *prima facie* evidence that the extrinsic contact occurred and that the contact exposed the jury to some improper influence or extraneous information that was prejudicial in nature. Once "it has been shown that a juror was exposed to extraneous prejudicial information or subjected to improper influence, a rebuttable presumption of prejudice arises, and the burden shifts to the State to explain the conduct or demonstrate that it was harmless." *Walsh v. State*, 166 S.W.3d 641, 647 (Tenn. 2005). However, both the defendant's ability to make a *prima facie* case and the State's ability to rebut it are limited in some important respects by Tennessee Rule of Evidence 606(b). *See id.* at 646-47.

Tennessee Rule of Evidence 606(b), which was adopted with modest changes from Federal Rule of Evidence 606(b), was intended to codify certain common law principles designed to protect the fundamental integrity of the jury's deliberative process. It provides:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon any juror's mind or emotions as influencing that juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes, except that a juror may testify on the question of whether extraneous prejudicial information was improperly brought to the jury's attention, whether any outside influence was improperly brought to bear upon any juror, or whether the jurors agreed in advance to be bound by a quotient or gambling verdict without further discussion. . . .

The rule was intended to encourage "full and frank discussion in the privacy of the jury room and protect[] jurors from harassment by the losing party who might seek to impeach the verdict." *Walsh*, 166 S.W.3d at 646. When applied in the context of a defendant's claim of juror bias stemming from an improper prejudicial extrinsic influence, however, our courts have construed the rule to apply not only to the losing defendant but also to the State. In some instances, Rule 606(b) curtails the State's ability to rebut the presumption of prejudice that attaches once a defendant has established that a juror was exposed to extraneous prejudicial information or subjected to an improper influence. This outcome, while modestly counterintuitive in light of Rule 606(b)'s second rationale, necessarily flowed from the Tennessee Supreme Court's decision in *Walsh*, which seemingly gave primacy to the need to protect a jury's deliberative processes against intrusion – even one by the State made in an effort to defend the jury's verdict against an attack by a losing party.

In *Walsh*, the court confronted a claim concerning a jury's subjection to an improper external influence that was not entirely dissimilar to the case at bar. The defendant in that case had been found guilty after a jury trial of aggravated sexual battery. At some point during the jury's deliberations, a court officer entered the jury room and was informed by a juror that the jury could not reach a verdict. Upon hearing this, the officer made a statement to the effect that "you have to" and left the room. Prior to this extrinsic contact, one juror had been the lone dissenting vote for not guilty. Thereafter, the defendant was unanimously convicted. At a subsequent hearing to address the defendant's challenge to the verdict, the former holdout juror testified to the facts described above but was further asked whether the communication was the basis for her change in vote or the basis of her verdict, and she testified that it was not. Reviewing this evidence, the trial court found that while an improper communication had occurred, the State had rebutted the resulting presumption of prejudice by establishing through the juror's direct testimony that the improper extrinsic influence had not affected the verdict.

This court affirmed but was reversed by the Tennessee Supreme Court, which concluded that the trial court had erred and violated Rule 606(b) by allowing the witness to testify regarding the subjective effect of the extrinsic contact on the verdict. *Id*. at 646, 649. In so doing, the *Walsh* court noted that, pursuant to Rule 606(b), a juror is not permitted to testify about anything occurring during deliberations, including the juror's own internal thoughts, motivations, or emotions. *Id*. at 647. The court observed that the rule contains three exceptions permitting a juror to give such testimony and that two of these explicit exceptions specifically encompass situations involving "extraneous prejudicial information" and "outside influence." *Id*. Rather than allowing these exceptions to permit extensive questioning of a former juror into the jury's deliberative process for purposes of more or less fully resolving these claims, as some courts had done previously, the *Walsh* court construed them in the more narrow fashion utilized by the

Seventh Circuit Court of Appeals. *Id*. at 649 (*citing, e.g., Haugh v. Jones & Laughlin Steel Corp.*, 949 F.2d 914, 918 (7th Cir. 1991)). According to the *Walsh* court, the proper procedure for a judge to follow under Rule 606(b) when analyzing a claim of juror bias based on the receipt of extrinsic prejudicial information or improper influence is:

> to limit the question asked the jurors to whether the communication was made and what it contained, and then, having determined that the communication took place and what exactly was said, to determine – without asking the jurors anything further and emphatically without asking them what role the communication played in their thoughts or discussions – whether there is a reasonable possibility that the communication altered their verdict.

*Id*. (*quoting Haugh,* 949 F.2d at 917).

The defendant asserts that, based upon this language of *Walsh*, the trial court erroneously failed to grant a new trial because the court relied upon testimony given by the foreperson to the effect that the communication did not influence his verdict. However, we disagree and hold that the trial court did not rely on any improper testimony in reaching its decision.

We reiterate that when the court below held a hearing on the defendant's claim, it should have followed the Tennessee Supreme Court's clear instruction in *Walsh*. Once questioning had established that an extrinsic contact had occurred and fully revealed the precise content of that contact, all questioning of the juror concerning the jury's deliberations should have ceased entirely. *See id.* at 649 (trial judges must resolve issue "without asking the jurors anything further" concerning their deliberative process). The court below, however, declined to require the prosecutor to end this particular line of questioning at the appropriate point and permitted some additional questions to be asked that should not have been asked.

A close review of the record in this case reveals that, while the trial court did allow the witness to testify concerning some improper topics, the court did not rely on the content of this testimony in reaching its ruling. Rather, the trial court permitted the State's questioning of the foreperson to continue beyond the limits authorized by *Walsh* under the mistaken premise that the court needed to do so as something akin to an "offer of proof," *i.e.,* something that was necessary for purposes of allowing the State to develop its record. The court went on to explain that "if there [are] parts of this information that I can't consider, then I won't."

After hearing all of the evidence, the court found that the defendant had established that an improper communication had occurred and that the burden had shifted to the State to rebut the ensuing presumption of prejudice. In ruling that the State had met this burden, the trial court explained:

Ms. Wilde, the court reporter here has looked up the case – they began deliberations on Thursday afternoon – whatever week this was. They adjourned for the day at 6:48 – that was on Thursday. So, they did deliberate for almost three hours; and that's when this – they went back to the hotel room. And on Friday morning, the deliberations continued. So, they did deliberate for three hours before being let go for the day. So, now the question in my mind is, did this enter into the deliberations. I see no – I see no other proof that it actually affected deliberations.

[Number One], when he received this note, he did not – they were not in deliberations. They were ordered not to deliberate. He was in his hotel room, and they didn't begin redeliberating until the next morning. So, this communication, if you want to talk semantics – if you want to get real picky about it – which apparently they want us to – it did not occur during deliberations, period.

So, the next day, without having shown this note to anyone else, deliberations resumed; and it wasn't until after the jury verdict was returned that he shared the information contained in the note with the other jurors.

I see no proof that this affected it in any way. The rebuttable presumption, I think it's rebuttable by the mere fact that it did not actually come in. None of the other jurors heard this or saw it or knew about it. So, if, in fact, he had brought it to the deliberations the next day and said, "Oh, by the way, these guys, they think he's guilty, so, therefore, we ought to vote" – it didn't affect it one way or another. I may be wrong, but the way I look at it, it did not enter deliberations. He had the benefit, as a juror, to sit there and talk about the facts of the case with the other jurors, whereas the alternates did not; and that's the reason why we all know that any lawyer never talks to the alternates because they usually get it wrong because they don't have the benefit of deliberating with the other jurors.

Conspicuously absent from the trial judge's reasoning is any reference to any of the foreperson's testimony regarding the jury's deliberative process. Based upon this record, we conclude that the trial court reached its decision that the defendant was not prejudiced by the communication without, in any way, considering the foreperson's

-15-

specific testimony that the communication did not affect the verdict and, therefore, did not rely on any information forbidden by *Walsh*.

The reasons given by the trial court to support its conclusion that the State carried its burden in rebutting the presumed prejudice which accompanies improper extrinsic communications focused on the fact that only the foreperson knew of the existence and content of the note, and the fact that he never told anyone made it clear that the content of the note never entered into the jury deliberation process. It is true that the entire venire was not tainted with the knowledge of what the vote of the two alternates would have been, but the foreperson was. So we must determine on this record whether there is a reasonable possibility that the note altered the foreperson's verdict. We note, as did the trial court, that the court properly charged the jury in this case, and juries are presumed to follow their charge. *See State v. Banks,* 271 S.W.3d 90, 134 (Tenn. 2008). The foreperson is selected by the members of the jury and shall preside over the deliberations. T.P.I. - Crim. 43.05 (10th ed. 2006). This foreperson, alone, received the note and never told any other juror. This foreperson had the benefit of the jury's deliberations. We presume this foreperson followed his charge.

In this case, the weight of the evidence alone would appear to be highly relevant to any analysis of the State's rebuttal case. The evidence against this defendant was overwhelming; the defendant himself confessed to the crime. Thus, the existing great weight of the evidence against this defendant suffices to rebut the presumption of prejudice that attached when the defendant established his *prima facie* case and rendered the improper extrinsic contact at issue nonprejudicial. We can discern nothing else in the record that indicates there was a reasonable possibility that this communication altered the foreman's verdict or the jury's verdict. As such, the defendant is not entitled to relief.

## V. Jury Instruction Request

Finally, the defendant contends that the trial court erred in denying his request for a jury instruction on diminished capacity, although we are somewhat unclear as to the defendant's reasoning behind his argument. The entire argument contained in the brief is as follows:

> After both sides rested [their] proof in chief, the jury was excused and a discussion was held as to the appropriate jury instructions. In addition, the Court denied the defendant's special request [number one] for a jury instruction on diminished capacity. The Court was of the opinion that the term "mental condition" was appropriate and that the words "diminished capacity" would not be appropriate. Therefore defendant's special request was denied by the Judge.

For all of the above reasons [the defendant] respectfully moves that the Court erred in denying defendant's special request. (*State v. Hall*, 958 S.W.2d 679 ([Tenn.] 1997).

From this, we can only assume that the defendant, on appeal, is relying only on *State v. Hall* as a reiteration of his argument made to the trial court. We review accordingly.

A defendant has a "constitutional right to a correct and complete charge of the law." *State v. Teel*, 793 S.W.2d 236, 249 (Tenn. 1990). In determining whether jury instructions are erroneous, this court must review the charge in its entirety and invalidate the charge only if, when read as a whole, it fails to fairly submit the legal issues or misleads the jury as to the applicable law. *State v. Vann*, 976 S.W.2d 93, 101 (Tenn. 1998). Special instructions are given "to supply an omission or correct a mistake made in the general charge, to present a material question not treated in the general charge, or to limit, extend, eliminate, or more accurately define a proposition already submitted to the jury." *State v. Cozart*, 54 S.W.3d 242, 245 (Tenn. 2001).

In requesting this special instruction, as noted, the defendant relied upon language in *State v. Hall*. The issue in *Hall* was whether expert testimony was admissible to demonstrate that the accused "lack[ed] the capacity, because of mental disease or defect, to form the requisite culpable mental state to commit the offense charged." *Hall*, 958 S.W.2d at 689. In holding that such evidence is admissible, the court emphasized, however, that the proof "must demonstrate that the defendant's inability to form the requisite culpable mental state was the product of mental disease or defect, not just a particular emotional state or mental condition." *Id*. at 690.

In the instant case, the defendant requested that the jury be charged with a special jury instruction on diminished capacity. "It is well settled that diminished capacity is not a defense capable of excusing or defeating a criminal charge in Tennessee." *State v. Grose*, 982 S.W.2d 349, 353 (Tenn. Crim. App. 1997). Diminished capacity can, however, be introduced to lessen an offense when it serves to negate *mens rea. Phipps,* 883 S.W.2d at 148. Evidence of an accused's mental state at the time of the commission of the crime is admissible to negate elements of specific intent, including premeditation and deliberation in a first degree murder case. *Id*. at 149. The defendant in this case was entitled to and did introduce evidence of his diminished mental abilities. He did this through presentation of the experts regarding his ingestion of Ambien and his alleged vulnerability to the drug.

In denying the defendant's special request, the trial court reviewed and evaluated the proof which was presented, including the testimony of the three experts called by the

defense. The court found that none of the proof presented established that the defendant was suffering from a mental disease or defect. Rather, the proof simply established that he was "vulnerable" with regard to the enhanced effects of Ambien. The trial counsel concluded that the special instruction on diminished capacity was not necessary in this case and that the pattern instruction was sufficient.

Following review, we find no error. The trial court properly reviewed the evidence in making its determination. The jury was instructed on the proper *mens rea* necessary to find the defendant guilty of first degree murder, including an instruction that they were to consider all evidence presented with regard to the defendant's ability to form the requisite intent. Having concluded that the jury was properly instructed, it follows that the defendant is entitled to no relief on this issue.

## CONCLUSION

Based upon the foregoing, the judgment of conviction and sentence in this case are affirmed.

_____
JOHN EVERETT WILLIAMS, JUDGE